

Opinions of the United
States Court of Appeals
for the Third Circuit

8-3-2006

# Gross v. German Foundation

Precedential or Non-Precedential: Precedential

Docket No. 04-2744

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Gross v. German Foundation" (2006). *2006 Decisions*. Paper 540.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/540

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

Nos. 04-2744 & 04-2745

———————

ELLY GROSS,
ROMAN NEUBERGER, JOHN BRAND,
in their individual capacities as third-party beneficiaries
of the agreements leading to the establishment of the
German Foundation "Remembrance, Responsibility,
and the Future," as representatives of all
German Foundation beneficiaries

Elly Gross,
Appellant at No. 04-2744

v.

GERMAN FOUNDATION INDUSTRIAL INITIATIVE,
and its constituent managing companies;
ALLIANZ AG; BASF AG; BAYER AG; BMW AG;
COMMERZBANK AG; DAIMLERCHRYSLER AG;
DEUTSCHE BANK AG; DEGUSSA-HUELLS AG;
DEUTZ AG; DRESDNER BANK AG;
FRIEDR KRUPP AG HOESCH KRUPP;
HOECHST AG; RAG AG;

ROBERT BOSCH GMBH; SIEMENS AG;
VEBA AG; VOLKSWAGEN AG,
sued individually, and as members of the
German Foundation Industrial Initiative

———————

BARBARA SCHWARTZ LEE;
BERNARD LEE,

      Appellants at No. 04-2745

v.

DEUTSCHE BANK AG; DRESDNER BANK AG

———————

On Appeal from the United States District Court
for the District of New Jersey
D.C. Civil Action Nos. 02-cv-2936 & 03-cv-3181
(Honorable William G. Bassler)

———————

Argued April 26, 2006

2

Before:  SCIRICA, *Chief Judge*,
SMITH and STAPLETON, *Circuit Judges**

(Filed August 3, 2006)

BURT NEUBORNE, ESQUIRE (ARGUED)
New York University Law School
40 Washington Square South
New York, New York 10012

AGNIESZKA FRYSZMAN, ESQUIRE (ARGUED)
Cohen, Milstein, Hausfeld & Toll
1100 New York Avenue, N.W., West Tower, Suite 500
Washington, D.C. 20005

ALLYN Z. LITE, ESQUIRE
Lite, Depalma, Greenberg & Rivas
Two Gateway Center, 12th Floor
Newark, New Jersey 07102
      Attorneys for Appellants, Elly Gross,
      Barbara Schwartz Lee and Bernard Lee

---

*This appeal was argued before the panel of Chief Judge Scirica, Judge Alito and Judge Rosenn on July 19, 2005.  The quorum was reconstituted to include Judge Smith and Judge Stapleton after the elevation of Judge Alito to the Supreme Court and the death of Judge Rosenn.  The case was reargued before the reconstituted panel on April 26, 2006.

JEFFREY A. BARIST, ESQUIRE (ARGUED)
Milbank, Tweed, Hadley & McCloy
One Chase Mahattan Plaza
New York, New York 10005
  Attorney for Appellees,
  Deutsche Bank AG and Dresdner Bank AG

ROGER M. WITTEN, ESQUIRE
Wilmer Cutler Pickering Hale and Dorr
399 Park Avenue, 30th Floor
New York, New York 10022
  Attorney for Appellees, Allianz AG, Bayer AG,
  Commerzbank AG, Deutz AG, and RAG AG

THOMAS M. MUELLER, ESQUIRE
Mayer Brown Rowe & Maw
1675 Broadway
New York, New York 10019
  Attorney for Appellee, BASF AG

KONRAD L. CAILTEUX, ESQUIRE
Weil, Gotshal & Manges
767 Fifth Avenue, 27th Floor
New York, New York 10153
  Attorney for Appellee, BMW AG

BUD G. HOLMAN, ESQUIRE
Kelley, Drye & Warren
101 Park Avenue, 29th Floor
New York, New York 10178
        Attorney for Appellee, DaimlerChrysler AG

KEVIN J. McKENNA, ESQUIRE
JOHN J. GIBBONS, ESQUIRE
Gibbons, Del Deo, Dolan, Griffinger & Vecchione
One Riverfront Plaza
Newark, New Jersey 07102-5497
        Attorneys for Appellees, Degussa-Huells AG,
        Friedr Krupp AG Hoesch Krupp, and
        Robert Bosch GmbH of Stuttgart, Germany

BRANT W. BISHOP, ESQUIRE
Kirkland & Ellis
655 15th Street, N.W., Suite 1200
Washington, D.C. 20005
        Attorney for Appellee, Siemens AG

DANIEL V. GSOVSKI, ESQUIRE
Herzfeld & Rubin
40 Wall Street
New York, New York 10005
        Attorney for Appellee, Volkswagen AG

WALTER E. DIERCKS, ESQUIRE
Rubin, Winston, Diercks, Harris & Cooke
1155 Connecticut Avenue, N.W., Suite 600
Washington, D.C. 20036
      Attorney for Amicus Curiae-Appellee,
      Federal Republic of Germany

---

## OPINION OF THE COURT

---

SCIRICA, *Chief Judge*.

At issue in this World War II reparations case is whether a suit seeking additional funds for victims of Nazi-era wrongs is justiciable. Claimants contend German companies owe "interest" on their payments to a reparations fund created with the substantial involvement of the United States and German governments to benefit Nazi victims or their descendants. The District Court held the claim presented a nonjusticiable political question. We will reverse and remand.

### I. Background

During the Nazi era, German companies employed slave and forced labor, appropriated private property, and refused to pay insurance policies. Legal redress was largely unavailable to

6

the victims of these crimes for nearly half a century[1] because their claims against the German government and German companies were barred or deferred by various international agreements and treaties, intended to facilitate the rebuilding of the German economy.[2]

The situation began to change after the fall of the Berlin Wall in November 1989, when the Federal Republic of Germany, the German Democratic Republic, the United States, Great Britain, France, and the former Soviet Union entered into

---

[1]World War II-era victims did receive some compensation for the harm they suffered.  The German government paid tens of billions of deutschmarks in compensation through domestic legislation and agreements with nations and non-governmental entities.  *See Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 404–05 (2003)*; Burger-Fischer v. Degussa AG*, 65 F. Supp. 2d 248, 270 (D.N.J. 1999).  But these measures excluded many victims and certain types of claims.  *Garamendi*, 539 U.S. at 404–06.

[2]For a history of negotiations between the Allied governments after Germany's defeat,  see generally *Garamendi*, 539 U.S. at 401–06; *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 447–55 (D.N.J. 1999); *Burger-Fischer*, 65 F. Supp. 2d at 265–72.

the Two-Plus-Four Treaty,[3] ending the rights formerly held by the Allies in Germany. The treaty was silent on the issue of private individuals' war-related claims against the German government and German companies, but German courts interpreted it to terminate the previous bar on such claims. *E.g.*, Oberverwaltungsgericht [OVG] [Administrative Court of Appeals, Muenster] NJW 1998, 2302, at 8–10, *cited in Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 455 (D.N.J. 1999); Landgericht [LG] [District Court, Bremen] 1998, 1 O 2889/90, at 13, *cited in Iwanowa*, 67 F. Supp. 2d at 455; *see also Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 404–05 (2003).[4]

In light of the German courts' interpretation of the treaty, many uncompensated victims brought claims against German companies in United States courts. Victims and their heirs, both individually and in class actions, sued banks, insurers, and manufacturers that had used or profited from slave and forced labor, or wrongfully appropriated assets during the National Socialist era. In response to early cases and in preparation for further litigation, seventeen major German corporations formed an unincorporated association called the German Foundation

---

[3]Treaty on the Final Settlement with Respect to Germany, Sept. 12, 1990, S. Treaty Doc. No. 101-20, 1696 U.N.T.S. 1115, 29 I.L.M. 1186.

[4]Some United States district courts disagreed, concluding the treaty's silence perpetuated the bar on reparations claims. *See, e.g.*, *Burger-Fischer*, 65 F. Supp. 2d at 272.

Industrial Initiative. The seventeen founding members were Allianz AG, BASF AG, Bayer AG, BMW AG, Commerzbank AG, DaimlerChrysler AG, Degussa Huls AG, Deutsche Bank, Deutz AG, Dresdener AG, Hoechst AG, RAG AG, Robert Bosch GmbH, Siemens AG, Veba AG, ThyssenKrupp AG, and Volkswagen AG.

## A. Negotiations for a Reparations Fund

The United States and German governments, aware of the significance of the underlying claims and the seriousness of the risk posed to the German economy, encouraged negotiations between plaintiffs and defendant German corporations. In the Fall of 1998, the German government asked Deputy Secretary of the Treasury Stuart Eizenstat[5] to facilitate a resolution of the class action suits. Over the next year and a half, Deputy Secretary Eizenstat chaired a series of meetings among lawyers for the victims, lawyers for the German companies, and representatives of the German government. Leading negotiations on the German side were Chancellor Schroeder's Envoy and Chief German Negotiator, Count Otto Lambsdorff, and his predecessor, Bodo Hombach.

---

[5]Before moving to the Treasury in 1999, Stuart Eizenstat served as the Secretary of State's Special Envoy on Property Restitution in Central and Eastern Europe (since 1995), as Under Secretary of State for Economic Affairs, and, before that, as Under Secretary of Commerce and United States Ambassador to the European Union.

On February 16, 1999, German Chancellor Gerhardt Schroeder, joined by the German companies that comprised the German Foundation Industrial Initiative, announced plans for formal negotiations to settle all pending litigation in United States courts relating to German companies' Nazi era conduct. The United States State Department hosted the first plenary session of formal negotiations on May 11 and 12, 1999. The goal was to create a foundation (a reparations fund) to compensate Nazi-era victims and to fund ongoing projects to prevent religious and ethnic intolerance in Germany. In exchange for funding the foundation, German companies would receive "legal peace"—the termination and resolution of all suits against them in United States courts on WWII-era claims and an assurance of protection from future suits.

A total of 12 plenary sessions were held in Bonn and Berlin, Germany, and in Washington, D.C. Lawyers in the pending cases joined government representatives from the United States, Germany, Israel, Belarus, the Czech Republic, Poland, Russia, Ukraine, representatives from the Conference on Jewish Material Claims Against Germany, and representatives from the German Foundation Industrial Initiative.

Negotiations reached a breakthrough in December 1999. Responding to an offer from the German companies to fund the foundation with DM 8 billion, the plaintiffs' lawyers, with the support of Poland, the Czech Republic, the Republic of Belarus, and the Ukraine, countered on December 13 with an offer for DM 10 billion. President Bill Clinton wrote to Chancellor

Gerhard Schroeder that day, urging acceptance of the DM 10 billion "counteroffer," which was "a firm commitment for settlement of which we both could be proud." *See Garamendi*, 539 U.S. at 405–06. The next day, Chancellor Schroeder accepted the counteroffer, thanking President Clinton for his "decisive impulses for a consensus which could be accepted by all parties involved." Also that day, Deputy Secretary Eizenstat communicated to the victims' attorneys the German Foundation Industrial Initiative's and German government's acceptance of this offer. President Clinton announced the agreement from the Oval Office the following day, December 15. Two days later, the parties made a formal public announcement in Bonn, Germany.

Over the ensuing months, the parties negotiated allocation details—how much money would go to each partner organization and which types of victims were eligible—and detailed procedures for the Foundation's operation. On July 20, 2000, the foundation, called "Remembrance, Responsibility and the Future," was formally established.

## B. The Berlin Accords

The documents establishing the Foundation, collectively referred to as the Berlin Accords or the Berlin Agreements, consist of the Joint Statement, the Executive Agreement between the United States and Germany, and the Foundation Law. The Joint Statement—formally titled "The Joint Statement on occasion of the final plenary meeting concluding international talks on the preparation of the Foundation

11

'Remembrance, Responsibility and the Future'"—sets forth the goal of the Foundation, which is to "provide dignified payments to hundreds of thousands of survivors and to others who suffered from wrongs during the National Socialist era and World War II." Preamble, para. 12. The Joint Statement commits the German government and German industry to a DM 10 billion capitalization, and places responsibility for collecting the German companies' share on the German Foundation Industrial Initiative. Particularly significant for this case, Section 4(d) of the Joint Statement provides, in part:

> German company funds will continue to be collected on a schedule and in a manner that will ensure that the interest earned thereon before and after their delivery to the Foundation will reach at least 100 million DM.

The second document of the Berlin Accords, the Executive Agreement, outlines the United States and German governments' commitment to the Foundation. It obligates the United States Executive, in all cases for which it is notified of a claim against a German company arising out of the WWII era, to file a statement of its foreign policy interests with the court in which the claim is pending, stating that United States' foreign policy interests favor resolution through the Foundation. Specifically, Article 2(1) of the Executive Agreement provides:

> The United States shall, in all cases in which the United States is notified that a claim described in article 1(1) has been asserted in a court in the

12

United States, inform its courts through a Statement of Interest, in accordance with Annex B, and, consistent therewith, as it otherwise considers appropriate, that it would be in the foreign policy interests of the United States for the Foundation to be the exclusive remedy and forum for resolving such claims asserted against German companies as defined in Annex C and that dismissal of such cases would be in its foreign policy interest.

*See also* Art. 3(4) ("The United States shall take appropriate steps to oppose any challenge to the sovereign immunity of the Federal Republic of Germany with respect to any claim that may be asserted against the Federal Republic of Germany concerning the consequences of the National Socialist era and World War II."). Article 1(1) describes the type of "claim" that triggers the filling of a Statement of Interest:

The parties agree that the Foundation "Remembrance, Responsibility and the Future" covers, and that it would be in the their interests for the Foundation to be the exclusive remedy and forum for the resolution of, all claims that have been or may be asserted against German companies arising from the National Socialist era and World War II.

The Executive Agreement also commits the German government to oversight of the Foundation. *See id.*, Art. 1(3)

13

("The Federal Republic of Germany assures that the Foundation will be subject to legal supervision by a German governmental authority[.]").

The final document of the Berlin Accords, the Foundation Law, is codified under German law. The Foundation Law went into effect on August 12, 2000, establishing the Foundation as a legal entity and an instrumentality of the German government, subject to initial oversight by the Ministry of Finance. Foundation Law § 8(1). It specifies that DM 5 billion of the Foundation's funding would be contributed by the German government, and the other DM 5 billion through the German Foundation Industrial Initiative. *Id.* §3(3). It establishes a 27-member Board of Trustees and a three-member Board of Directors. *Id.* §§ 5–6. The Board of Trustees is to make decisions on "all fundamental matters" relating to the Foundation, *id.* § 5(5), and to perform roughly the same function a board of directors would perform in a United States corporation. The United States is permitted to appoint two members to the Board of Trustees: a representative of the United States government and an attorney to represent the interests of the victims. The Board of Directors is to represent the Foundation in judicial and extrajudicial matters, manage the day-to-day business of the Foundation, and implement the decisions of the Board of Trustees, *id.* § 6(3), and in this way to function like the officers of a United States corporation.

## C. Obtaining Dismissals of Cases Pending in United States Courts

14

The Berlin Accords conditioned contributions to the Foundation on the dismissal of all pending and future WWII-era claims against German companies in United States courts. Joint Statement, Preamble, para. 13; *id.*, § 4(b). Claimants contend at the time the Joint Statement and Executive Agreement were signed on July 17, 2000, the parties expected it would take about six months to obtain dismissal of cases then pending in United States courts. In August 2000, at the request of the parties, the Judicial Panel on Multi-District Litigation consolidated fifty-three cases involving slave and forced labor claims—most of which were putative class actions—before Judge Bassler in the United States District Court for New Jersey. MDL Transfer Order, No. 1337 (August 4, 2000); *see In re Nazi Era Cases Against German Defs. Litig.*, 213 F. Supp. 2d 439, 442 (2002). Suits involving unpaid insurance policies proceeded in the Southern District of New York before Chief Judge Mukasey; and suits against German banks involving unpaid insurance policies proceeded in the Southern District of New York before Judge Kram.

After consolidation of the slave and forced labor claims but before class certification, the parties sought permission to dismiss the suits with prejudice in light of the proposed payments from the Foundation. Judge Bassler approved the voluntary dismissals of 49 pending cases on December 5, 2000, but sounded a cautionary note:

> [O]f great concern to Plaintiffs in these actions is the prospect that full funding of the Foundation

15

might never be achieved, and that as a result they would have dismissed their claims with prejudice for nothing. The Court shares this understandable concern, and for this reason all of the Orders of Dismissal (with the consent of the parties) were made expressly subject to Federal Rule of Civil Procedure 60(b). . . . Pursuant to Rule 60(b), should the Foundation not achieve full funding, Rule 60(b) would provide the Plaintiffs who have dismissed with prejudice their complaints in reliance on full funding with an avenue for relief.

*In re Nazi Era Cases*, 213 F. Supp. 2d at 445 (citing *In re Nazi Era Cases Against German Defs. Litig.*, 198 F.R.D. 429, 446–47 (D.N.J. 2000)). On December 14, 2000, Chief Judge Mukasey similarly entered an order granting leave to dismiss the actions against the German insurance companies.

Judge Kram refused to grant voluntary dismissal of the plaintiffs' claims against the German banks. On March 8, 2001, she denied the voluntary motion to dismiss because it would "subject all absent class members to the detrimental statement of interest and the other terms of the Compact, even though the absent class members' only source of compensation for their claims has yet to be fully funded." *See In re German and Austrian Bank Litig.*, No. CIV 3938 SWK, 2001 WL 228107, at *6 (S.D.N.Y. Mar. 8, 2001). At a May 10, 2001 rehearing, Judge Kram granted the motion to dismiss, conditioning the grant on certain changes to the Foundation's allocation schedule.

16

*See Duveen v. U.S. Dist. Court (In re Austrian & German Holocaust Litig.)*, 250 F.3d 156, 160–62 (2d Cir. 2001). Plaintiffs and defendants sought a writ of mandamus. On May 17, 2001, the Court of Appeals for the Second Circuit granted the writ, compelling Judge Kram to grant leave to dismiss all claims without conditions. *Id.* at 165. The judge granted the dismissals on May 18 and 21, 2001. On May 30, the German legislature declared "legal peace," triggering the obligations of the German government and the German companies' to each pay DM 5 billion to the Foundation. On October 19, 2000, the United States and German governments exchanged diplomatic notes stipulating, in accordance with Article 5 of the Executive Agreement, that the Executive Agreement entered into force on that same date.

With all cases pending in United States courts dismissed and with the Executive Agreement in force, the German government fulfilled its DM 5 billion commitment in two equal payments on October 31, 2000, and December 31, 2000. The German Foundation Industrial Initiative was not as prompt. The parties dispute the timing and amounts of the German Foundation Industrial Initiative's payments toward its obligation of DM 5 billion principal, plus DM 100 million "interest." In June 2001 it transferred the contributions it had collected to date, which represented the bulk of its payments. It made another contribution in October 2001. After a final payment in December 2001, the German Foundation Industrial Initiative's contribution totaled DM 5.1 billion.

17

## D. Dispute Over the "Interest" Obligation

The parties' dispute in this case centers on the German Foundation Industrial Initiative's obligation to pay "interest" on the German companies' DM 5 billion contribution to the Foundation. Section 4(d) of the Joint Statement provides:

> Assuming the request for transfer referred to in paragraph (e) is granted, the DM 5 billion contribution of German companies shall be due and payable to the Foundation and the payments from the Foundation shall begin once all lawsuits against German companies arising out of the National Socialist era and World War II pending in U.S. courts including those listed in Annex C and D are finally dismissed with prejudice by the courts. . . . German company funds will continue to be collected on a schedule and in a manner that will ensure that the interest earned thereon before and after their delivery to the Foundation will reach at least 100 million DM.

The Joint Statement uses the term "German companies," defined in Annex A, to describe the German corporations, and other businesses, that would contribute DM 5 billion to the Foundation in exchange for "legal peace." The Joint Statement provides that if the full contribution were not raised from the German companies, the seventeen founding members of the Initiative would make up the difference. In exchange, the

18

founding members had exclusive decision making authority for the Initiative.

Claimants contend the German Foundation Industrial Initiative owes "interest" in excess of the amount of DM 100 million set forth in Section 4(d) of the Joint Statement. Interpreting "at least" as a floor and not a ceiling, they contend "interest" is owed in the amount earned on third-party contributions for the period those contributions were held by the German Foundation Industrial Initiative prior to their transfer to the Foundation. Claimants also contend "interest" is owed to compensate the Foundation for the unexpected delay in the German Foundation Industrial Initiative's completion of its contribution—for the time period between dismissal of the last case and full payment of the obligation.

Claimants contend the parties intended "interest" would be payable at four percent on all funds collected by the Initiative from German businesses, and that this rate should be used to calculate the additional "interest" due. Their theory is that the "interest" amount of DM 100 million in the Joint Statement was calculated using the July 2000 German statutory default interest rate, which was four percent. Contending the parties expected legal peace to be achieved within six months after the Joint Statement's signing, they note that applying a four percent rate to DM 5 billion for six months amounts to DM 100 million. As for when "interest" obligations commenced, claimants alternatively contend additional "interest" payments were due from the time of Judge Kram's refusal to grant dismissal until

19

the day the German Foundation Industrial Initiative fully contributed its principal obligation or from the day the Bundestag declared legal peace until the day of final payment.[6]

The German Foundation Industrial Initiative contends nothing is due beyond the DM 5.1 billion German companies have paid. It contends the DM 100 million was an absolute ceiling on "interest" payments, explaining this amount did not represent actual interest earned on the DM 5 billion. Rather, it was additional funding intended to break an impasse in the allocation negotiations among the victims' representatives. It was labeled "interest" so as not to breach the DM 10 billion cap—a breach that might have upset the fixed expectations of the German companies and the German government on the agreed-to DM 10 billion figure. The German Foundation Industrial Initiative cites a letter from President Bill Clinton to Chancellor Gerhard Schroeder, describing the DM 10 billion as a "ceiling agreed [to] by all participants in this process."

---

[6]In addition to claiming "interest" owed during these delays, claimants assert other dates from which to measure "interest" owed: onward from December 14, 1999, when the parties orally agreed on the Berlin Accords; onward from July 17, 2001, when the parties signed the Joint Statement; onward from when the German Foundation Industrial Initiative received funds from the German businesses and other groups, on a rolling basis; and onward from when founding members of the German Foundation Industrial Initiative took a certain tax credit under German law. (Appellees' Br. 15–16.)

The German Foundation Industrial Initiative contends that putting the merits of the "interest" dispute aside, this case raises a nonjusticiable political question. It contends the Joint Statement is a political and diplomatic statement rather than an enforceable contract or settlement agreement and that United States courts have no authority to "rewrite" the document to include new obligations. The German Foundation Industrial Initiative also contends the United States Executive has made a decision, reflected in the Berlin Accords, to commit supervision and administration of the Foundation to diplomacy or to the German government. Moreover, if the United States courts do not refrain from adjudicating the case because it presents a nonjusticiable political question, the German Foundation Industrial Initiative contends they should do so under the act of state doctrine or under the doctrine of international comity.

Claimants respond this case is justiciable as a basic contract dispute. They contend the Joint Statement either constitutes or includes a contract. They also contend contractual obligations were created by the German Foundation Industrial Initiative's oral promises to pay DM 5 billion, beginning in mid-December 1999, and by representations before United States judges that if the judges dismissed the cases, the German Foundation Industrial Initiative would fully fund the Foundation.

The United States government addressed the "interest" issue in two letters. The first, relied upon heavily by the

German Foundation Industrial Initiative in litigation, was written by the Deputy Secretary of State Richard Armitage in response to an April 18, 2002 letter from Dr. Otto Graf Lambsdorff, the Vice Chairman of the Board of Trustees of the Foundation, also the former German Federal Minister of Finance and the German Federal Chancellor's personal representative to the Board of Trustees of the Foundation. *Gross v. German Found. Indus. Initiative* (*In re Nazi Era Cases Against German Defs. Litig.*), 320 F. Supp. 2d 235, 250 (D.N.J. 2004). The undated letter makes two general points: first, the United States' interests are better met through political rather than judicial resolution of this dispute; second, the United States takes no position on whether additional funds are due. The full text of the letter reads:

> Dear Otto:
>
> I am writing in response to your letter of April 18, to share with you U.S. views concerning the obligations of German companies with regard to interest payments.
>
> President Bush reaffirmed the United States' support for the German Foundation, "Remembrance, Responsibility and the Future," on the occasion of Chancellor Schroeder's March 2001 visit to Washington. You can be assured that the United States has never wavered from its strong commitment, memorialized in the Executive Agreement of July 17, 2000, to help achieve all-embracing and enduring legal peace

22

for German companies operating in the United States. We will continue to work closely with the Federal Republic of Germany to ensure the success of the Foundation. I also assure you that the interest issue does not affect the U.S. Government's obligation to file statements of interest in individual cases pursuant to the Executive Agreement. We will continue to satisfy that obligation.

We have made many attempts to resolve this issue over the past several months together with your government, the Foundation, and the Foundation Initiative. Our goal has been to ensure that all obligations are met in the course of the Foundation's implementation, while at the same time bearing in mind our shared vision of legal peace. The policy of the United States has been that the proper venues for addressing issues concerning the Foundation are in the Foundation or through U.S.-German diplomacy. Therefore, the U.S. Government believes that matters concerning interest payments should be resolved as a political matter in these domains, not by the courts.

Neither the Joint Statement nor the Executive Agreement conclusively provides for the disposition of interest earned prior to the transfer of the industry contribution to the

23

Foundation. At this time, there is no shared understanding among the participants to the Foundation negotiations as to their intent with respect to the disposition of such interest. Nor does the negotiating history provide a basis for decisively resolving disagreements on the interest issue. The Joint Statement states in paragraph 4(d) that "German company funds will continue to be collected on a schedule and in a manner that will ensure that the interest earned thereon before and after their delivery to the Foundation will reach at least 100 million DM."

The German Finance Ministry and the Foundation Board of Directors have provided their view that the Foundation Initiative has met its legal and financial obligations. The Foundation Board of Directors' letter of April 4 confirmed that the companies had paid DM 5 billion plus DM 100 million in interest to the Foundation, and that the Foundation had earned additional interest of DM 90 million on the companies' contribution after the transfer. The Directors's December 11, 2001, letter asserted that the Foundation Initiative has met the financial commitments it made in the Joint Statement. The Finance Ministry, which is responsible under German law for legal oversight of the Foundation, also has stated that German industry has "fulfilled

24

its obligations vis-a-vis the [Foundation] to their full extent."

The U.S. Government has no independent information that conclusively resolves disagreements surrounding the interest issue. It is not in a position to say that German industry has a commitment to provide additional funds beyond the DM 5.1 billion previously transferred to the Foundation. With respect to any U.S. court cases that may be brought against German entities on the question of pre-transfer interest, the U.S. Government will be guided by this view.

I am pleased to learn that the Foundation's tremendous progress continues, and that $1.3 billion in payments have been made to some 750,000 surviving forced and slave laborers. German-American cooperation has made a significant contribution to the reconciliation between Germany and the victims of National Socialism, especially those in Central and Eastern Europe who were caught behind the Iron Curtain without recognition of their suffering. Our common effort demonstrates our shared commitment to human dignity, especially as many of these countries turn to our democracies to help shape their future. German-American cooperation in addressing the injustices of the past is but one element of our joint effort to expand the

25

community of nations that cherish the values of democracy, tolerance and economic freedom.

I look forward to the satisfactory resolution of the insurance issues as well as future reports on the Foundation's achievements.

Sincerely,
Richard L. Armitage[7]

The second letter addressing the issue was written by William R. Kirschner, a trial attorney for the United States Department of Justice, Civil Division. Sent to Judge Bassler on July 22, 2002, in advance of oral argument on the claimants' 60(b) motion, discussed below, it was the only official correspondence sent to a United States judge regarding the "interest" dispute. Kirschner was silent on the United States' position as to justiciability and the proper forum in which to resolve the dispute, but expressly disclaimed a position on the merits. The letter reads:

Dear Judge Bassler:

It has come to our attention that there is a proceeding currently before you in which one of the issues is whether the German Foundation

---

[7]*See* Letter from Deputy Secretary of State Richard Armitage to Chancellor's Representative Otto Graf Lambsdorff (undated) ["the Armitage letter"], filed in *In re Nazi Era Cases Against German Defendants Litig.*, MDL No. 1337, Civ. No. 98-CV-4104 (WGB) (D.N.J.).

"Remembrance, Responsibility, and the Future" was fully funded with respect to the contributions owed by German companies, and, in particular whether the German companies paid sufficient interest on their promised DM 5 billion contribution.

The U.S. Government has no independent information that conclusively resolves disagreements surrounding the interest issue. It is not in a position to say whether or not German industry has a commitment to provide additional funds beyond what has been transferred to the Foundation.

Sincerely yours,

William R. Kirschner[8]

## II. Procedural History

This is not the only litigation associated with the "interest" dispute. Certain slave labor claimants brought a Fed. R. Civ. P. 60(b) motion before Judge Bassler to enforce the "settlement" and for declaratory relief. *See In re Nazi Era Cases*, 213 F. Supp. 2d at 439. To avoid jeopardizing the entire

---

[8]*See* Letter from William R. Kirschner, Trial Attorney, U.S. Dept. of Justice, to Judge William G. Bassler (July 22, 2002) ["the Kirschner letter"], filed in *In re Nazi Era Cases Against German Defendants Litig.*, MDL No. 1337, Civ. No. 98-CV-4104 (WGB) (D.N.J.).

resolution and the payment of the DM 10 billion to the victims, claimants declined to move to reopen under Rule 60(b). Instead, they asked the court to define the defendants' "interest" obligation. On July 23, 2002, the District Court held it had not retained jurisdiction to enforce the "settlement." *Id.* at 450.

On October 18, 2001, attorney Michael Hausfeld sought an order in the United States District Court for the Eastern District of New York to prevent the United States from filing a statement of interest urging dismissal of related cases. *See Ukrainian Nat'l Ass'n of Jewish Former Prisoners of Concentration Camps & Ghettos v. United States*, 178 F. Supp. 2d 312, 314 (E.D.N.Y. 2001). The court dismissed the case without prejudice, holding it had no authority to prevent the United States from filing a statement of interest in other litigation. In November 2001, attorney Burt Neuborne sought an order directing payment of all "interest" allegedly due from the Foundation. *See Neuborne v. German Found. Indus. Initiative*, No. CV-01-7701 (E.D.N.Y. filed Nov. 16, 2001). At the request of a German negotiator, Neuborne withdrew the lawsuit shortly thereafter, intending to pursue negotiations with the German Foundation Industrial Initiative.

In May 2002, Hausfeld brought an action in California state court on behalf of third-party beneficiaries of the Foundation, suing under state law for unlawful, deceptive, and unfair business practices stemming from the "interest" dispute. *See Widerynski v. Deutsche Bank AG*, No. BC274449 (Cal. Super. Ct. filed May 23, 2002). In January 2003, the court

28

dismissed the action for failure to state a claim under California law and also by reason of international comity. The court observed the case "is a classic paradigm for the application of international comity . . . where, as here, a foreign country's laws and executive actions bar the suit, the foreign country has a substantial interest in the matter, the country has provided an appropriate method of resolving it, and there is no overriding U.S. interest to the contrary." *Widerynski v. Deutsche Bank AG*, No. BC274449, op. at *6 (Cal. Super. Ct. Jan. 31, 2003).

This case was filed in June 2002, when Elly Gross, Roman Neuberger, and others brought a claim as third-party beneficiaries for breach of contract against the German Foundation Industrial Initiative and against its founding companies. In July 2003, Bernard and Barbara Schwartz Lee brought a similar breach of contract action as third-party beneficiaries against Deutsche Bank AG and Dresdner Bank AG. Claimants in both cases were either named plaintiffs or class members in the Nazi-era cases brought against German corporate defendants consolidated before Judge Bassler. Responding to a defense motion, the District Court dismissed both cases as presenting nonjusticiable political questions on June 8, 2004. *Gross*, 320 F. Supp. 2d at 252. Both cases were consolidated for appeal.

## III. Standard of Review and Jurisdiction

The District Court had diversity jurisdiction under 28 U.S.C. § 1332(a)(2). We have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review because the actions were

29

dismissed under the political question doctrine. *New Jersey v. United States*, 91 F.3d 463, 466 (3d Cir. 1996). Justiciability under the political question doctrine is a matter of federal law. *See Banco National de Cuba v. Sabbatino*, 376 U.S. 398, 425 (1964). Our review under the act of state doctrine and international comity is plenary because the District Court did not reach these issues. *See Specter v. Garrett*, 971 F.2d 936, 942–43, 955–56 (3d Cir. 1992), *vacated on other grounds by* 506 U.S. 969 (1992).

## IV. Discussion

Questions of justiciability are distinct from questions of jurisdiction, and a court with jurisdiction over a claim should nonetheless decline to adjudicate it if it is not justiciable. *Baker v. Carr*, 369 U.S. 186, 198 (1962). At issue here is whether the "interest" dispute is justiciable.

The German Foundation Industrial Initiative contends we should dismiss this case as a nonjusticiable political question because: (1) the President of the United States made a decision, reflected in the Berlin Accords, to relegate the supervision and administration of the Foundation to German sovereignty or to diplomacy, (2) the Joint Statement is a political and diplomatic statement rather than an enforceable contract or settlement agreement, and (3) the United States judiciary should refrain from "rewriting" the Joint Statement to include obligations not addressed in that political document. Alternatively, the German Foundation Industrial Initiative contends we must decline to

30

adjudicate this case under either the act of state doctrine or the doctrine of international comity.

Claimants respond this case is justiciable as a basic contract dispute involving the interpretation of Section 4(d) of the Joint Statement. They contend a contract was created by reason of (1) the Joint Statement, either by itself or as a memorialization of the December oral agreement, (2) oral promises beginning in mid-December 1999 by the German Foundation Industrial Initiative to pay DM 5 billion, and (3) representations made by the German Foundation Industrial Initiative's lawyers before United States judges, constituting an enforceable promise binding the German Foundation Industrial Initiative.

As an initial matter, we decline to consider the oral statements made in December 1999 and those made before United States judges. As claimants define it, the dispute in this case is over the meaning of the "interest" provision in the Joint Statement. (Appellants' Br. 18 ("The precise legal issue before the Court is the construction of the term 'at least' as used in Defendants' promise . . . to pay interest on the deferred payment of DM 5 billion.").) But the oral communications in December 1999 occurred before the Joint Statement was adopted. As a result, they do not bear on our analysis of whether a dispute arising from the Joint Statement is justiciable. Nor do the alleged promises made to United States judges. As claimants concede, if the Berlin Accords do not require additional "interest" payments, the promises in United States courts to

31

follow through on their terms cannot independently require additional payments. If at all relevant, the promises made before judges might provide evidence that the German Foundation Industrial Initiative is bound to pay additional "interest" under Section 4(d) of the Joint Statement. But this goes to the merits of the "interest" dispute and not to the question of justiciability. Accordingly, our analysis focuses on claimants' contention that the Joint Statement creates enforceable obligations and this case is justiciable as a basic contract dispute.

## A.  The Political Question Doctrine

"The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986). As a general matter, the conduct of foreign relations is constitutionally committed primarily to the Executive Branch. *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 706 n.18 (1976); *see also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 386 (2000) ("The 'nuances' of the 'foreign policy of the United States . . . are much more the province of the Executive Branch and Congress than of this Court.'") (quoting *Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 196 (1983)); *Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention.").

32

But the Court has cautioned that not "every case or controversy which touches foreign relations lies beyond judicial cognizance," *Baker*, 369 U.S. at 211. "[U]nder the Constitution, one of the Judiciary's characteristic roles is to interpret statutes[, treaties, and executive agreements]," and "we cannot shirk this responsibility merely because our decision may have significant political overtones." *Japan Whaling*, 478 U.S. at 230. Accordingly, a predicted negative impact on foreign relations does not, by itself, render a case nonjusticiable under the political question doctrine.

In determining the presence or absence of a nonjusticiable political question, whether or not foreign relations are implicated, we consider six factors articulated by the Court in *Baker v. Carr*:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political

> decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. at 217. Each of these factors "has one or more elements which identify it as essentially a function of the separation of powers." *Id*. A finding of any one of the six factors indicates the presence of a political question. *See INS v. Chadha*, 462 U.S. 919, 941 (1983). Should a factor be present, a holding of nonjusticiability still depends on whether the factor is "inextricable from the case at bar." *Baker*, 369 U.S. at 217. Aware that "the 'political question' label" can "obscure the need for case by case inquiry," *id.* at 210–11, we necessarily avoid "resolution by any semantic cataloguing," *id.* at 217. Instead, we undertake a "discriminating inquiry into the precise facts and posture of the particular case." *Id*.

## 1. The District Court's Analysis

Consistent with the approach of most courts in focusing only on those *Baker* factors applicable in a given case, the District Court analyzed this matter under the fourth factor—expressing lack of respect for coordinate branches of government—and the sixth factor—embarrassment arising from multifarious pronouncements. *Gross*, 320 F. Supp. 2d at 254. In concluding the case presented a political question under both of these factors, the District Court focused on two issues: (1) the relationship between the "interest" dispute and the history of the underlying reparations claims, and (2) the letter from Deputy Secretary of State Armitage expressing "U.S. views concerning

34

the obligations of German companies with regard to interest payments." *Id.* at 252–53. With respect to the first issue, the District Court characterized the "interest" dispute as "the coda in the long drama of disagreements concerning Holocaust-era restitution." *Id.* at 253. Recognizing that "matters of Holocaust-era restitution are best resolved through dialogue, negotiation, and cooperation as opposed to prolonged and uncertain litigation," *id.* at 252 (quoting *Frumkin v. JA Jones, Inc.* (*In re Nazi Era Cases Against German Defs. Litig.*), 129 F. Supp. 2d 370, 380 (D.N.J. 2001)), the court explained that these considerations are "no less evident . . . when the core issue is not whether restitution is proper, but how much restitution, namely in the form of interest, was agreed upon." *Id.* With respect to the second issue, the court characterized the Armitage letter as an expression of the United States Executive's position that the United States judiciary was not the proper forum for this dispute's resolution. The court concluded the letter demonstrated that the United States and Germany had "committed the resolution of this issue to diplomacy over litigation." *Id.* at 253.

We agree with the District Court that these two factors—(1) the relationship of the "interest" dispute with the strong history of executive management of Nazi-era reparations claims, and (2) the presence of an expression of interest from the United States Executive—inform our analysis, and should be addressed before we discuss each *Baker* factor. We believe the parties' characterizations of the Joint Statement should also be discussed before reaching the *Baker* factors. For reasons that

35

follow, we reach a conclusion different from that of the District Court. We conclude that adjudicating the "interest" dispute would not present a nonjusticiable political question.

## 2. Reliance on History of Management

A strong history of the United States Executive's management of a dispute does not necessarily render a case nonjusticiable, just as a weak history does not rule out questions of justiciability. But a strong history of management is potentially relevant to an analysis of some of the *Baker* factors. For example, judicial intervention redirecting consistent Executive decision making could constitute policy-making under the third *Baker* factor. Judicial intervention where certain executive pronouncements have historically controlled a dispute could express a lack of respect for the Executive under the fourth *Baker* factor. We note that while a strong history of management is not one of the six factors, the *Baker* Court listed it as a relevant inquiry, commonly employed by courts that had found a political question in foreign-relations cases.[9]

_____

[9]In its analysis, the *Baker* Court examined prior foreign policy cases that wrestled with nonjusticiability principles:

> Our cases in this field seem invariably to show a discriminating analysis of the particular question posed, in terms [1] of the history of its management by the political branches, [2] of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and [3]

There is a long history of executive management of the reparations claims underlying the "interest" dispute, with little judicial intervention. For sixty years, it has been the consistent policy of the United States to address compensation for Nazi-era injuries through diplomacy and through German government institutions, and not through litigation in United States courts. *See Garamendi*, 539 U.S. at 420–21 ("The issue of restitution for Nazi crimes has in fact been addressed in Executive Branch diplomacy and formalized in treaties and executive agreements over the last half century, and . . . securing private interests is an express object of diplomacy today, just as it was addressed in agreements soon after the Second World War."). Many courts have treated Holocaust reparations cases as nonjusticiable disputes, even where private parties are bound up in the litigation.[10]

of the possible consequences of judicial action. *Baker*, 369 U.S. at 211.

[10]Before the Foundation was created, two district courts determined that the political question doctrine barred Nazi-era claims from adjudication in American courts. *See Burger-Fischer v. Degussa AG*, 65 F. Supp. 2d 248, 282 (D.N.J. 1999); *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 489 (D.N.J. 1999); *see also Kelberine v. Societe Internationale*, 363 F.2d 989, 995 (D.C. Cir. 1966) (holding suit for Nazi-era property damage was "not presently susceptible of judicial implementation").

37

After the Foundation was created, the Court of Appeals for the Eleventh Circuit held that claims by an heir against two German banks, for assets allegedly stolen during the Nazi regime, were not political questions despite the Executive's filing of a Statement of Interest, but the court chose nonetheless to abstain under the international comity doctrine. *Ungaro-Benanges v. Dresdner Bank AG*, 379 F.3d 1227, 1235–37 (11th Cir. 2004). The Court of Appeals for the Second Circuit found a political question and dismissed Nazi-era property deprivation claims against Austria and Austrian companies, citing the Austrian version of the Berlin Accords' Foundation and a statement of interest filed by the United States government. *Whiteman v. Dorotheum GMBH*, 431 F.3d 57, 58–60 (2d Cir. 2005).

The Court of Appeals for the Ninth Circuit recently held that the political question doctrine did not bar Holocaust survivors' World War II-era claims against the Vatican Bank regarding restitution of property. *Alperin v. Vatican Bank*, 410 F.3d 532, 538 (9th Cir. 2005). In *Alperin*, however, the Ninth Circuit found that "the Executive has declined a long-standing invitation to involve itself in the dispute," *id.*, which distinguishes *Alperin* from this case, in which the Executive was key to negotiating the Berlin Accords. *Alperin* also recognized the abrogation of *Kelberine* in light of modern complex litigation procedures. *Id.* at 554–55.

Other Holocaust-era claims have settled prior to resolution of the political question issue. *See In re Austrian &*

Whether this strong history of executive management of Holocaust reparations claims bears on our analysis under the *Baker* factors depends on whether the "interest" dispute is a final but inseparable part of the prior nonjusticiable claims or whether it is something different. If, as the District Court concluded, the "interest" dispute is the inseparable "coda" in the sixty-year history of international diplomatic negotiations, *Gross*, 320 F. Supp. 2d at 253, the strong history of executive management would dominate our *Baker* analysis. But if the "interest" issue presents a distinct dispute, our *Baker* analysis will place less emphasis on the United States Executive's past actions and statements and on the judiciary's past responses in related cases.

We believe the present dispute raises issues that are significantly different from those in cases that have been dismissed from United States courts under the political question doctrine. It is true that a judgment for the claimants would require payment to the Foundation, translating to increased payments to victims. But there is a difference between a suit for reparations and a suit to enforce an alleged contract for "interest." As the District Court recognized, "the core issue is

_____

*German Bank Holocaust Litig.*, 80 F. Supp. 2d 164 (S.D.N.Y. 2000) (litigation against Austrian banks); *In re Holocaust Victim Assets Litig.*, 105 F. Supp. 2d 139 (E.D.N.Y. 2000) (litigation against Swiss banks).

not whether restitution is proper, but how much restitution, namely in the form of interest, was agreed upon." *Gross,* 320 F. Supp. 2d at 252.  The District Court concluded nonetheless that the "interest" dispute could not be separated from prior nonjusticiable reparations claims.  But the present dispute is not over a reparations claim, but over a specific "interest" provision in a recently negotiated document.  This distinction removes the dispute from the history of the underlying claims and distinguishes it from other cases dismissed by United States courts.

Were the "interest" dispute inextricable from the long history of Executive management, we would expect some communication from the United States Executive—direct Executive intervention, a Statement of Interest under the Executive Agreement, a statutory statement of interest under 28 U.S.C. § 517, a letter to the court, or any other way in which the United States Executive can make its interests known to a court. As we discuss, the United States Executive has declined to express a position to the United States courts either on the merits of the "interest" claim or on whether the matter should be resolved in a diplomatic or judicial forum.  The United States Executive's one communication expressing a position on justiciability—the Armitage letter—was not directed to a United States court.

Were the "interest" dispute inextricable from the history of judicial noninvolvement in reparations cases, we would also

40

expect ongoing diplomacy to resolve the issue.[11] *See Alperin v. Vatican Bank*, 410 F.3d 532, 558 (9th Cir. 2005) (holding no political question where "[i]n the landscape before us, this lawsuit is the only game in town with respect to claimed looting and profiteering by the Vatican Bank. No ongoing government negotiations, agreements, or settlements are on the horizon."). There has been no representation that the United States government is engaged in any form of diplomacy or negotiations regarding the payment of additional "interest."[12]

We do not think the Supreme Court's opinion in *Garamendi* informs our inquiry into whether the strong history of executive management bears heavily on our justiciability analysis. The German Foundation Industrial Initiative contends *Garamendi*—which, in the context of a preemption analysis, gave strong deference to Executive prerogative in foreign

---

[11]The United States' signing of the Berlin Accords did not predetermine the proper forum by which parties would enforce the "interest" provision of the Joint Statement. *See Gross,* 320 F. Supp. 2d at 248–49 ("Defendants' interpretation that the Joint Statement itself provides that the interest obligations are properly decided by the Foundation appears incorrect.").

[12]In a July 11, 2005, letter to this Court, Neuborne reported that the State Department informed him that no diplomatic negotiations were underway with Germany on the "interest" issue. Letter from Burt Neuborne to Marcia Waldron, Clerk, United States Court of Appeals for the Third Circuit.

affairs—stands for the proposition that the United States Executive has an "exclusive role in matters relating to the Foundation and Nazi-era claims against German nationals." (Appellees' Br. 27.) *Garamendi* addressed a California statute requiring any insurer doing business in the state to disclose certain information about Holocaust-era insurance policies that had been in effect between 1920 and 1945, and that the insurer or a related company had sold to persons in Europe. 539 U.S. at 409–10. The Court noted, "[t]he issue of restitution for Nazi crimes" falls within the Executive's powers, and "has in fact been addressed in Executive Branch diplomacy and formalized in treaties and executive agreements over the last half century." *Id.* at 420–21. The point of the California statute in *Garamendi* was to provide information about decades-old insurance policies, so that their holders or descendants would be able to sue on these policies. Besides its disclosure requirement, the state statute amended California's rules of civil procedure to allow "state residents to sue in state court on insurance claims based on acts perpetrated in the Holocaust." *Id.* at 409. These claims to enforce insurance policies were the claims the Foundation was set up to exclusively resolve. Furthermore, the Supreme Court did not venture outside the confines of its preemption analysis to address questions of justiciability. To the extent the issues of executive prerogative raised in *Garamendi* apply, they are accounted for in our discussion of the six *Baker* factors.

We believe the "interest" dispute is distinct from the underlying reparations claims, which led to the creation of the

42

Foundation.  Accordingly, we will place less emphasis on the strong history of executive management of Nazi-era reparations cases in our analysis under the *Baker* factors than did the District Court.

### 3.  United States' Expressions of Its Interest

A second factor central to our analysis under the *Baker* factors is the presence or absence of a formal expression to the courts of the United States Executive's interests in this dispute. With respect to this issue, the District Court focused on the Armitage letter, believing it to be an expression of the United States Executive's interest.  As noted, the Armitage letter makes two general points: the United States' interests are better met through political rather than judicial resolution of the "interest" dispute, and the United States takes no position on whether additional funds are due.  The letter is silent on whether the Berlin Accords support a private, contract-based right of action.

Certain questions frame our discussion of the Armitage letter.  First, was the United States obligated to file a Statement of Interest, as described in Annex B to the Joint Statement? Second, how does this impact what weight we should give the Armitage letter as an expression of the United States Executive's interests?  Our answer to the first question informs our answer to the second.  If a Statement of Interest were required under the Executive Agreement, the United States Executive's decision not to file one would demonstrate that its interests align with judicial adjudication of the merits.  We would then give little weight to the Armitage letter.  If a

43

Statement of Interest were not required under the facts of this dispute, we would attach greater weight to the Armitage letter as the only expression we have of the Executive's position. A third question would then arise: does the Armitage letter constitute a definite and authoritative expression of interest to which we should defer, considering its content and the fact that the United States Executive has declined to file a statutory statement of interest or other communication with this Court?

### a. The Failure of the United States Executive to File a Statement of Interest

Under the facts of this dispute, we do not think the United States was obligated by any provision of the Berlin Accords to file the Statement of Interest as set forth in Annex B of the Executive Agreement.[13] In the Executive Agreement, the

---

[13]We note that at the second oral argument, neither the claimants nor the German Foundation Industrial Initiative appeared to challenge this conclusion. Had we found a Statement of Interest was indicated by the facts of this case, then the United States might be in breach of the Executive Agreement. *See Ungaro-Benanges*, 379 F.3d at 1236 ("The United States is in full compliance with the Foundation Agreement so long as it files a statement of interest to courts urging respect for the Foundation as the exclusive forum to resolve these claims."). Our analysis acknowledges the Executive's compliance with the Executive Agreement.

United States promised it would file a Statement of Interest in a certain set of cases:

> The United States shall, in all cases in which the United States is notified that a claim described in article 1(1) has been asserted in a court in the United States, inform its courts through a Statement of Interest, in accordance with Annex B, and consistent therewith, as it otherwise considers appropriate, that it would be in the foreign policy interests of the United States for the Foundation to be the exclusive remedy and forum for resolving such claims asserted against German companies as defined in Annex C and that dismissal of such cases would be in its foreign policy interest.

Executive Agreement, Art. 2(a). Article 1(1), in turn, describes the covered claims as ". . . all claims that have been or may be asserted against German companies arising from the National Socialist era and World War II." This is the same standard by which the United States and Germany would decide the class of claims for which the Foundation would be the "exclusive remedy and forum." Art. 1(1); *see also* Joint Statement, Preamble, para. 14 ("exclusive remedy and forum").

The definition of claims that "arise from" WWII and the National Socialist era—which would trigger the obligation to file a Statement of Interest and make the Foundation the exclusive remedy and forum for the claim—should include those

45

claims the Berlin Accords were organized to dismiss: slave labor claims, claims regarding banks' wrongful retention of assets, insurance claims pending in United States courts, and similar suits that would be filed in the future. In the context of "exclusive remedy and forum," the District Court recognized that these restitution and reparations claims differed from the present "interest" dispute. *See Gross*, 320 F. Supp. 2d at 248–49. The District Court discussed the "arising from" definition at length, concluding the Foundation was not the exclusive forum for the "interest" dispute. *See id.*

The United States' commitment to file a Statement of Interest and the exclusive jurisdiction of the Foundation turn on the definition of the same phrase: "arising out of the National Socialist era and World War II." Interpreting this phrase consistently in both instances, we conclude the claim for additional "interest" does not trigger the United States' obligation to file an Annex B Statement of Interest in certain cases.[14]

---

[14]Central to our conclusion that the Berlin Accords do not require the United States Executive to file a Statement of Interest in this case are the language and context of the text of the Executive Agreement and Joint Statement. Several practical reasons provide secondary support. For example, a case "arising from" WWII has a variety of problems not shared by the present "interest" dispute, including stale or missing evidence, deceased or missing witnesses, and legal hurdles such as statutes of limitation or treaties and German domestic law that might

When filed, the Statement of Interest outlined in the Berlin Accords explains that because of foreign policy interests, the United States Executive prefers dismissal and resolution through the Foundation. Annex B to the Executive Agreement further describes the types of cases for which the Foundation shall be the exclusive forum:

> [T]he President of the United States has concluded that it would be in the foreign policy interests of the United States for the Foundation to be the exclusive forum and remedy for the resolution of all asserted claims against German companies arising from their involvement in the National Socialist era and World War II, including without limitation those relating to slave and forced labor, aryanization, medical experimentation, children's homes/Kinderheim, other cases of personal injury and damage to or loss of property, including banking assets and insurance policies.

The language supports the view that the claims for which the Foundation is the exclusive forum and remedy, and for which the United States is required file a Statement of Interest, are reparations and restitution cases, and not the present "interest" dispute.

---

supercede the claim.

The contrast is striking between the United States Executive's inaction on the "interest" claim in this case and its intervention in other cases for direct restitution or reparations where it filed a statement of interest. This contrast supports our view that a Statement of Interest (Annex B) was not required here. The United States filed a statement of interest—similar to that outlined in Annex B—in a private suit for Nazi-era property damage against the Austrian government and Austrian entities. *See Whiteman v. Dorotheum GMBH*, 431 F.3d 57, 58–63 (2d Cir. 2005) (describing the General Settlement Fund, an Austrian reparations scheme modeled after that of the Berlin Accords). In dismissing WWII-era property damage claims against Austria and Austrian companies on political question grounds, *id.* at 72–73, the Court of Appeals for the Second Circuit relied on the United States Executive's statement of interest for several points: the Fund encourages good relations with Austria, Eastern Europe, and Israel; negotiation is a better means to claim resolution than is litigation; the Fund represents the culmination of sixty years of diplomacy; and the outcome of litigation on the same claims is uncertain at best. *Id.* at 66–68. The *Whiteman* court explained:

> [W]e hold that deference to a statement of foreign policy interests of the United States urging dismissal of claims against a foreign sovereign is appropriate where, as here, (1) the Executive Branch has exercised its authority to enter into executive agreements respecting the resolution of those claims; (2) the United States Government

48

(a) has established through an executive agreement an alternative international forum for considering the claims in question, and (b) has indicated that, as a matter of foreign policy, the alternative forum is superior to litigation; and (3) the United States foreign policy advanced by the executive agreement is substantially undermined by the continuing pendency of the claims.

*Id.* at 59–60.

Even the Armitage letter distinguishes the "interest" dispute from one in which the Executive Agreement requires the United States to file a Statement of Interest. It explains: "the interest issue does not affect the U.S. Government's obligation to file statements of interest in individual cases pursuant to the Executive Agreement." With this, Deputy Secretary Armitage acknowledged—and we agree—the United States Executive was not required under the Executive Agreement to file a Statement of Interest in this case.

**b. Expression of the United States Executive's Position**

We look to other potential indications and expressions of the United States Executive's interest, the most obvious being the Armitage letter. But for several reasons, we conclude the Armitage letter does not constitute a policy determination by the United States Executive, or an authoritative expression of Executive interest, to which we should defer. The Armitage letter is directed to Otto Lambsdorff, the Vice Chairman of the

49

Foundation's Board of Trustees. It is not directed to the United States court adjudicating the "interest" dispute, or to any court for that matter. The letter states the proper forum for resolution of the "interest" dispute is political and diplomatic, not legal. But it explicitly leaves open the merits question, stating "[t]he U.S. Government has no independent information that conclusively resolves disagreements surrounding the interest issue." Furthermore, the letter fails to declare the United States Executive will seek intervention or dismissal.

The Supreme Court instructs "'case-specific deference' to the expressed foreign policy interests of the United States." *See Whiteman*, 431 F.3d at 59 (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 733 n.21 (2004)). We conclude the Armitage letter, making no promises to seek dismissal or that the United States Executive would intervene, does not require or counsel our deference. *Cf. Republic of Austria v. Altmann*, 541 U.S. 677, 702 (2004) (finding courts might defer to "the considered judgement of the Executive on a particular question of foreign policy").

The Kirschner letter, although directed to the court, does not change our view. As noted, the Kirschner letter was written to Judge Bassler in advance of oral argument on the 60(b) motion. It is the only formal correspondence from the United States Executive to a court on the "interest" dispute, albeit from a Department of Justice trial attorney and not from a State Department official. Kirschner was silent on the position of the United States as to justiciability and the proper forum in which

50

to resolve the dispute, but explicitly disclaimed a position on the merits, stating the United States Executive "is not in a position to say whether or not German industry has a commitment to provide additional funds." Kirschner's position is consistent with the decision of the United States Executive not to file an Annex B Statement of Interest and with the lack of ongoing diplomacy on the "interest" issue.

The United States could have expressed an interest in this case through other means. The United States Executive has the statutory authority, in any case in which it is interested, to file a statement of interest:

> The Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States.

28 U.S.C. § 517 ("Interests of United States in Pending Suit"). This authority is wholly separate from the obligations of the Joint Statement. Alternatively, the United States could have intervened in the case or petitioned the court to participate as amicus curiae. But the United States has declined to express to the District Court or to this Court a position on the justiciability or merits of the "interest" dispute, except its lack of a position. It has also declined to inform the District Court or this Court of its position on the proper forum for resolution or on whether we

51

should dismiss on political question grounds. Because the United States Executive has declined to take a formal position on the justiciability of this case or on the merits of the "interest" claim, we conclude the United States Executive has not, through an expression of its interest in the case, committed the "interest" dispute to a political branch.

## 4. Joint Statement

The final issue we address before analyzing the "interest" dispute under the *Baker* factors is the parties' characterizations of the Joint Statement—the document giving rise to the claim that additional "interest" is due. Claimants ask us to view the Joint Statement as a contractual settlement agreement. They note the resulting arrangement bears the hallmarks of an enforceable contract, with parties exchanging promises and taking action to their detriment in reliance on those promises. They contend plaintiffs in pending cases would never have agreed to the dismissal of their cases with prejudice without a contractual obligation on the part of the German government and industry to fund the Foundation pursuant to the Joint Statement. They contend the language of Section 4(d) reads like a contract between private parties, even if other portions of the document contain precatory and diplomatic language.

The German Foundation Industrial Initiative asks us to read the Joint Statement like a political statement, containing diplomatic commitments and memorializing negotiations among sovereign states. The German Foundation Industrial Initiative notes that the arrangement between the private litigants and the

52

German government and industry would never have been possible without the high-level diplomatic efforts of the governments of several nations.

We recognize there is much to support the view of the German Foundation Industrial Initiative that the Joint Statement is a political document. The German Foundation Industrial Initiative cites Ronald J. Bettauer, Deputy Legal Adviser in the United States State Department, who participated in the negotiations between the United States and German governments culminating in the Berlin Accords. He characterized the Joint Statement as follows:

> As the negotiations came to a conclusion, we needed a document indicating what further steps it was agreed each participant would take. It would not have been appropriate to have an international agreement between individual lawyers, private companies, an NGO and sovereign states. We therefore developed a document that set forth political rather than legal commitments—that is, undertakings that various participants "will" take various steps, rather than legal commitments that they "shall" do so. At this phase, we were once again involved in a negotiation with all the participants on the text of what became the "joint statement." This document set forth the undertakings of each party as to the steps it would take. This final aspect of

> the arrangement was more akin to a resolution that an international organization adopts. But this was not a negotiation in an international organization.

Ronald J. Bettauer, *Keynote Address—The Role of the United States Government in Recent Holocaust Claims Resolution*, 20 Berkeley J. Int'l L. 1, 3 (2002).

Much of the text of the Joint Statement also supports the German Foundation Industrial Initiative's view. The document describes diplomatic commitments between and among the nation-signatories. *E.g.*, § 4(b) (providing the United States and Germany "will" sign an Executive Agreement); § 4(c) (stating that the governments of Israel and certain European states "will implement" measures to ensure legal peace). And much of the text declares principles rather than binding agreements. Section 1 of the Joint Statement announces "all participants consider the overall result and the distribution of the Foundation funds to be fair to the victims and their heirs." Section 2 states "the primary humanitarian objective of the Foundation . . . is to show results as soon as possible." These broad principles arguably do not appear to define or guarantee legal obligations among private parties.

The German Foundation Industrial Initiative also points to what it considers a specific directive that the Joint Statement cannot serve as a basis for contractual claims against Germany or German companies. Specifically, the Preamble "recogniz[es] that the establishment of the Foundation does not create a basis

54

for claims against the Federal Republic of Germany or its nationals . . . .'"[15] Preamble, para. 15. Claimants respond the purpose of this language is to clarify that payment to the Foundation of the agreed sum did not constitute an admission of liability—a standard settlement provision. "Claims" could also be read to refer to Nazi-era reparations claims, not to claims for additional "interest."

We believe the parties' characterizations of the Joint Statement bear primarily on the merits of the "interest" dispute and not the question of justiciability. We need not decide whether the high-level diplomatic efforts of various governments in negotiating the Joint Statement or the document's precatory and diplomatic language means Section 4(d) does not impose binding and enforceable obligations on the parties. We need only determine whether it is possible and appropriate for a United States court to address and answer these questions. Accordingly, we will give little weight to the parties' overall characterizations of the Joint Statement in our justiciability analysis. But we will consider various aspects of their arguments. For example, the key role in negotiations played by high-level United States officials will inform our analysis under the fourth and sixth factors—addressing whether a court would contradict Executive pronouncements or embarrass other branches of government in adjudicating the

---

[15]The term "nationals" applies to German companies. *See S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group, Ltd.*, 181 F.3d 410, 417 (3d Cir. 1999).

case. And the text of the Joint Statement itself will inform our analysis under the second and third factors—addressing whether a court would have discoverable and manageable standards for resolving the "interest" dispute and whether they could do so without making inappropriate policy determinations.

## 5. The *Baker v. Carr* Factors

We now turn to an analysis of the "interest" dispute under the six *Baker* factors. For reasons that follow, we do not think this case presents a political question under any of the *Baker* factors.

The first factor asks whether there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department." *Baker*, 369 U.S. at 217. The German Foundation Industrial Initiative has identified no specific constitutional text that commits the issues raised by this case to the Executive. Instead, it argues that this case raises questions that are within the constitutional province of the Executive in foreign affairs as recognized by the Court in *Garamendi*.

We recognize that, even though the Executive's powers in foreign affairs "do[] not enjoy any textual detail" within the Constitution itself, "in foreign affairs the President has a degree of independent authority to act." *Garamendi*, 539 U.S. at 414. Those powers include the power to resolve issues like the one raised by the claimants and to settle the claims of its citizens against foreign governments and corporations. *Id.* at 415–16.

But it is precisely the breadth of the Executive's power in this field that counsels against our finding that the political question doctrine precludes our review. While the Executive could constitutionally act to resolve the issue of whether "interest" is owed on this "contract" or to settle this claim through diplomacy, it has not done so. If we were to find that any claim raising an issue that the Executive could potentially resolve within its constitutional "independent authority to act" in foreign affairs to be nonjusticiable, we would risk erroneously sweeping "every case or controversy which touches foreign relations . . . beyond judicial cognizance." *Baker*, 369 U.S. at 211. The mere existence of the Executive's power to extinguish claims made to the Judiciary for redress from foreign entities and to resolve certain issues raised in those claims, without an exercise of that power, does not render those claims nonjusticiable by virtue of being committed to a co-equal branch.

The second *Baker* factor asks whether there is "a lack of judicially discoverable and manageable standards for resolving" the case. *Id.* at 217. We believe the legal and factual questions presented by the "interest" dispute are of the type the judiciary is constitutionally competent to resolve under the Constitution, and equipped to resolve as a practical matter. In adjudicating the case, a court would have to interpret the Berlin Accords—specifically, Section 4(d) of the Joint Statement—to determine whether there is a binding, contractual "interest" obligation. A court would face at least two questions on the merits of this dispute: (1) is the Joint Statement, or part of the Joint Statement, enforceable as a private contract, and (2) if so,

57

what "interest" obligation, if any, did the parties intend for the German Foundation Industrial Initiative?

Courts have standards by which to answer both questions. Courts routinely determine if a written text is an enforceable contract, relying on the text itself and on such parol evidence as the law allows, and routinely address questions of agency, third-party beneficiaries, and damages. The complexity of the contract issue—overlapping as it does with the law of international agreements—does not leave a court without standards. *See Alperin*, 410 F.3d at 552–55 (finding no political question on the second factor, in a WWII-era restitution case against the Vatican Bank, in part because "courts have repeatedly risen to the challenge of handling cases involving international elements as well as massive, complex class actions"). That this case might require the deposition of government witnesses may complicate the court's task, but it does not make this claim resemble those in which the judiciary lacks standards to render a decision.

We note that even where significant foreign policy concerns are implicated, a case does not present a political question under this factor so long as it involves "normal principles of interpretation of the constitutional provisions at issue," *Wang v. Masaitis*, 416 F.3d 992, 996 (9th Cir. 2005) (quoting *Goldwater v. Carter*, 444 U.S. 996, 999 (1979) (Powell, J., concurring)), normal principles of statutory construction, *see Japan Whaling*, 478 U.S. at 230, or normal principles of treaty or executive agreement construction, *see id.*

58

In *Japan Whaling*, the Court found no political question in deciding if an executive agreement with Japan regarding commercial whaling conflicted with the Secretary of Commerce's obligations under a federal statute. *Id.* at 229–230, 240–41 ("As *Baker* plainly held . . . the courts have the authority to construe treaties and executive agreements, and it goes without saying that interpreting congressional legislation is a recurring and accepted task for the federal courts.").

Unlike other political question cases, this case does not involve a political rather than legal standard. *See New Jersey v. United States*, 91 F.3d 463, 469–70 (3d Cir. 1996) (holding courts are without judicially manageable standards for resolving issues about how best to enforce national immigration laws or to allocate resources for same); *Guerrero v. Clinton*, 157 F.3d 1190, 1196 (9th Cir. 1998) (holding there was a lack of "judicially manageable standards by which to gauge the fidelity" of the Secretary of Commerce's response to a congressional reporting mandate, when reports triggered no legal consequences (quoting *Nat'l Res. Def. Council, Inc., v. Hodel*, 865 F.2d 288, 319 (D.C. Cir. 1988))). Nor is there a proposed standard under which the court lacks the criteria to adequately assess the claims before it. *See Vieth v. Jubelirer*, 541 U.S. 267, 281, 284–90 (2004) (plurality) (comparing racial gerrymandering of political districts to political gerrymandering and finding judicially manageable standards for the former but not for the latter); *Atkepe v. United States*, 105 F.3d 1400, 1404 (11th Cir. 1997) ("In order to determine whether the Navy conducted the missile firing drill in a negligent manner, a court

59

would have to determine how a reasonable military force would have conducted the drill."), *cited in Alperin*, 410 F.3d at 555.

This court has standards by which to construe this alleged contract, despite the issues' complexity and despite the involvement of foreign nations and the United States Executive in negotiating the Berlin Accords. Accordingly, this case does not present a political question under the second *Baker* factor.

The third *Baker* factor asks whether adjudicating the case would require "an initial policy determination of a kind clearly for nonjudicial discretion." *Baker*, 369 U.S. at 217. Under this factor, a political question is implicated if in deciding the case, a court would have to make a policy determination of the kind appropriately reserved for diplomatic—and thus Executive—discretion. *See e.g.*, *Atkepe*, 105 F.3d at 1404 (holding the case nonjusticiable, in part, because the policy determination would be of a kind reserved for military discretion). A political question under the third factor "exists when, to resolve a dispute, the court must make a policy judgment of a legislative nature, rather than resolving the dispute through legal and factual analysis." *EEOC v. Peabody W. Coal Co.*, 400 F.3d 774, 784 (9th Cir. 2005).

Resolution of the "interest" dispute would undoubtedly impact foreign relations and foreign policy. Furthermore, deciding the dispute whether additional "interest" is due might require a court to determine what the political sovereigns intended when they drafted the Joint Statement. As noted, the record reveals high-level diplomatic involvement by the

governments of many nations in negotiating the Berlin Accords, and the Joint Statement memorializes many aspects of these diplomatic negotiations.

But the question under the third *Baker* factor is not whether a court will impact foreign policy, but rather whether it will impermissibly intrude on the Executive's role in formulating policy. From time to time, courts decide cases that impact foreign policy. *See, e.g.*, *Japan Whaling*, 478 U.S. at 230 (noting that although the "[j]udiciary is particularly ill suited" to make decisions that "revolve around policy choices," it cannot avoid its responsibility to interpret statutes and treaties "merely because our decision may have significant political overtones"). The question is whether a court can decide the "interest" dispute without displacing the Executive in its foreign policy making role. We conclude that it can. In adjudicating the case, a court would be interpreting an agreement already created and signed by another branch of government to determine whether it contains an enforceable obligation for additional "interest." Interpreting agreements and deciding the nature and scope of the parties' obligations based on text and evidence are among the activities that courts often perform without considering public policy—foreign or domestic. A court need not make "an initial policy determination of a kind clearly for nonjudicial discretion" before resolving the issues presented in this case.

Our conclusion might be different if the current "interest" dispute were truly the inseparable "coda" to sixty years of

judicial noninvolvement, in which any judicial intervention related to WWII reparations would encroach on decisions reserved for the discretion of the United States Executive. But because we conclude the "interest" issue is distinct from the underlying reparations claims, we believe courts are equipped to determine, without making foreign policy, if the Joint Statement contains a private enforceable agreement. Accordingly, this case does not present a political question under the third *Baker* factor.

Under the fourth *Baker* factor, we ask whether it would be possible for a court to "undertak[e] independent resolution without expressing lack of the respect due coordinate branches of government." *Baker,* 369 U.S. at 217. Had the United States Executive filed a statutory statement of interest under 28 U.S.C. § 517, a Statement of Interest under Annex B of the Executive Agreement, or any other document with this Court asserting its interests in dismissal, we might conclude judicial intervention would contradict and show a lack of respect for a statement or pronouncement of the United States Executive. *See, e.g.*, *Joo v. Japan*, 413 F.3d 45, 48 (D.C. Cir. 2005) ("[W]e defer to the judgment of the Executive Branch of the United States Government, which represents, in a thorough and persuasive Statement of Interest, that judicial intrusion into the relations between Japan and other foreign governments would impinge upon the ability of the President to conduct the foreign relations

62

of the United States.").[16]  But the United States Executive has taken no position on the merits of this dispute, and has not promised dismissal or intervention.  While the Armitage letter states a preference for diplomacy, we have concluded it does not constitute an Executive expression of interest to which we should defer.  Furthermore, there is no ongoing diplomacy to resolve this matter.  There is no possibility of expressing a lack of respect due the Executive branch when the Executive has not expressed its interest in the dispute.  Accordingly, the fourth *Baker* factor does not render this dispute nonjusticiable.

The fifth *Baker* factor asks whether there is "an unusual need for unquestioning adherence to a political decision already made." *Baker*, 369 U.S. at 217.  The Armitage letter might itself be described as a "political decision" (that is, it is an expression of the United States Executive's decision that this case be dealt through diplomatic, and not legal, channels).  But even if we accept this characterization of the Armitage letter, we do not

---

[16]In *Joo*, the court dismissed on political question grounds a suit by foreign-citizen plaintiffs against Japan alleging torture related to the WWII era, and the United States intervened with a statement of interest, to which the court deferred.  413 F.3d. at 48–53 (affirming dismissal).  The *Joo* court quoted the statement of interest, which argued "it manifestly was not the intent of the President and Congress to preclude Americans from bringing their war-related claims against Japan . . . while allowing federal or state courts to serve as a venue for the litigation of similar claims by non-U.S. nationals." *Id.* at 50.

63

think this case presents an "unusual need for unquestioning adherence" to that decision. As *Baker* makes clear, the fifth factor contemplates cases of an "emergency[ ] nature" that require "finality in the political determination," such as the cessation of armed conflict. *Id.* at 213–14. Determining the end of hostilities between nations is markedly different from the issue before us, which does not require the same kind of finality and does not implicate the same kind of "emergency" issues that define a war. Accordingly, the fifth *Baker* factor does not render this case nonjusticiable.

The sixth and final *Baker* factor asks about the potential of "embarrassment from multifarious pronouncements by various departments on one question." *Id.* at 217. This factor, like the fourth and fifth, is "relevant only if judicial resolution of a question would contradict prior decisions taken by a political branch in those limited contexts where such contradiction would seriously interfere with important governmental interests." *Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995). Underlying this factor is the idea that a foreign government should be able to trust that diplomatic pronouncements from the United States Executive are authoritative. But here, there was no pronouncement from the United States Executive. Even if authoritative, the Armitage letter made no representations that the United States would intervene or seek dismissal. To the contrary, the letter strongly implied that a Statement of Interest would not be filed in this case: "I also assure you that the interest issue does not affect the U.S. Government's obligation to file statements of interest in

64

individual cases pursuant to the Executive Agreement."  The one Executive letter addressed to a United States court—the Kirschner letter—declined to mention a preference for a diplomatic solution.  Accordingly, finding this case justiciable does not risk creating multifarious pronouncements.

Had the United States  Executive desired, it could have filed a statutory statement of interest under 28 U.S.C. § 517, substantially similar to that in Annex B of the Executive Agreement, urging dismissal.[17]  But the United States government filed no document with a court pointing to its interests or to any foreign-policy positions that would be contradicted were we to hold this case justiciable.  *See Baker*, 369 U.S. at 212 ("[I]f there has been no conclusive 'governmental action' [on whether a treaty was terminated] then a court can construe a treaty and may find it provides the

---

[17]On this point, even the Statement of Interest, from Annex B of the Executive Agreement, fails to promise dismissal:  "The United States does not suggest that its policy interests concerning the Foundation in themselves provide an independent legal basis for dismissal, but will reinforce the point that U.S. policy interest favor dismissal on any valid legal ground."  Promising dismissal, then, would have gone further than did the Executive Agreement to secure legal peace.  But in this case, it is likely the filing of a Statement of Interest (or statutory statement of interest) would have resulted in dismissal, on political question grounds or otherwise. *See, e.g.*, *Whiteman*, 431 F.3d at 72–74.

answer."). Nor have the German companies or the German government directed us to any statements of the United States government that a holding of justiciability might contradict, or to the attendant risk of embarrassment for the United States Executive. As a result, holding this case justiciable is "not incompatible with any formal position thus far taken by the political branches. By the same token, [our] decision does not turn a blind eye to any position expressed by those responsible for conducting the nation's foreign relations." *Ungar v. PLO*, 402 F.3d 274, 281 (1st Cir. 2005) (affirming denial of sovereign immunity to the Palestinian Liberation Organization, in a tort suit by estates of victims of terrorism, and finding no political question). Finally, there is no ongoing diplomacy to restrain us from asserting jurisdiction.

The German Foundation Industrial Initiative places great weight on the portion of the Armitage letter which states "the U.S. Government believes that matters concerning interest payments should be resolved as a political matter in these domains, not by the courts." But the "multifarious pronouncements" that give rise to a nonjusticiable political question involve conflicting pronouncements regarding the merits, not conflicting pronouncements about justiciability. Even where the Executive has directly argued that a question is nonjusticiable and threatens the separation of powers, the Supreme Court has found the judiciary ultimately decides these issues and has, at times, reached conclusions in conflict with the Executive's conclusions. *See, e.g.*, *Clinton v. Jones*, 520 U.S. 681, 699–700 (1997); *United States v. Nixon*, 418 U.S. 683,

692–93 (1974). It is conflicting opinions by the Executive and the Judiciary about whether "interest" is owed on this "contract" that would give rise to a political question. As noted, there is no such pronouncement by the Executive. Accordingly, we conclude the sixth Baker factor, like the first five, does not render this case nonjusticiable under the political question doctrine.

## B. The Act of State Doctrine

Having found the claimants' actions constituted a nonjusticiable political question, the District Court did not decide whether it should refrain from adjudicating the claims under the act of state or international comity doctrines. *Gross*, 320 F. Supp. 2d at 253 n.21.

Under the act of state doctrine, American courts are precluded from "inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964); *see also* Restatement (Third) of Foreign Relations Law § 443(1) (1987) (explaining American courts should not invalidate the "acts of a governmental character done by a foreign state within its own territory and applicable there"). Courts must dismiss under the act of state doctrine when resolution of a suit would require the court to declare invalid and ineffective as "a rule of decision for the courts of this country" the official act of a foreign sovereign. *W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp.*, 493 U.S. 400, 405 (1990) (citing *Ricaud v. Am. Metal Co.,* 246 U.S. 304, 310 (1918)).

The act of state doctrine "does not bestow a blank-check immunity upon all conduct blessed with some imprimatur of a foreign government." *Timberlane Lumber Co. v. Bank of Am.*, 549 F.2d 597, 606 (9th Cir. 1976) (citing *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962)), *superceded by statute on other grounds*, Pub. L. No. 97-290, 15 U.S.C. § 6a. That predicate sovereign act is always required for successful invocation of the doctrine. "In every case in which we have held the act of state doctrine applicable, the relief sought or the defense interposed would have required a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory." *W.S. Kirkpatrick*, 493 U.S. at 405.

A predicate sovereign act is not present in this case. The German Foundation Industrial Initiative and the German government as amicus curiae cite letters from the Ministry of Finance and from the Foundation's Board of Directors, concluding that no further "interest" is due. *See* Letter of Hans Eichel, German Minister of Fin., to Colin Powell, U.S. Sec'y of State (July 24, 2002); Letter from Michael Jansen, Chairman of the Board of Dirs., German Foundation Industrial Initiative, to Dieter Kastrup, Chairman of the Foundation Bd. of Trustees (July 2, 2002); Letter of Rainer M. Turmer, on behalf of the German Ministry of Fin., to Dieter Kastrup (April 12, 2002). These are not official acts of a foreign sovereign, nor is the February 16, 2004, letter from German Ambassador Wolfgang Ischinger to Judge Bassler, requesting dismissal. As the District Court noted, the German officials' statements "explicate

68

Germany's understanding of the interest issue," but they are not "definitive." *Gross*, 320 F. Supp. 2d at 250.

Even were a sovereign act presented, we have not been asked to declare an official act of a foreign sovereign "invalid." Rather, we have been asked to give decisive weight to the determination of certain Foundation officers and the German Minister of Finance that the German Foundation Industrial Initiative fulfilled its obligations under the Joint Statement. Ruling on the merits here would neither ignore nor invalidate the official acts of the German government. Accordingly, the act of state doctrine does not counsel dismissal.

## C. The Doctrine of International Comity

International comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." *Hilton v. Guyot,* 159 U.S. 113, 164 (1895); *see Remington Rand v. Bus. Sys. Inc.*, 830 F.2d 1260, 1266 (3d Cir. 1987). Generally, United States courts will not review acts of foreign governments and will defer to proceedings taking place in foreign countries, allowing those acts and proceedings to have extraterritorial effect in the United States. *See, e.g.*, *Somportex Ltd. v. Philadelphia Chewing Gum Corp.*, 453 F.2d 435, 440–44 (3d Cir. 1971); *Pravin Banker Assocs. v. Banco Popular Del Peru*, 109 F.3d 850, 854 (2d Cir. 1997). But a court may deny comity to a foreign legislative, executive, or judicial act if it finds that

69

the extension of comity "would be contrary or prejudicial to the interest" of the United States. *Somportex*, 453 F.2d at 440.

The German Foundation Industrial Initiative has not pointed to an ongoing or pending proceeding taking place in Germany. It contends instead that "[m]aintenance of these lawsuits would conflict with these German executive and legislative actions," embodied in the Berlin Accords, and that Germany's oversight of the Berlin Accords is "exclusive." (Appellees' Br. 40.) The German Foundation Industrial Initiative also argues that in view of the statements by the Foundation's Board of Directors and the German Finance Ministry that no additional money is due, we should dismiss this case out of respect for decisions made by the German Executive under German law. Ruling on the claimants' action, the German Foundation Industrial Initiative contends, would require reviewing these official acts and pronouncements of the German government.

The Supreme Court has emphasized, if there is no foreign judgment or ongoing proceeding in a foreign tribunal, application of international comity principles requires the presence of a "true conflict" between United States law and foreign law. *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 798–99 (1993). Unless foreign law either requires a foreign entity "to act in some fashion prohibited by the law of the United States," or makes "compliance with the laws of both countries . . . impossible," a court need not abstain based on principles of international comity. *See id.*

Absent true conflicts, a judgment from a foreign court, or parallel proceedings in a foreign forum, rarely have United States courts abstained from deciding the merits of a case on international comity grounds. *See, e.g.*, *United States ex rel Saroop v. Garcia,* 109 F.3d 165, 170 (3d Cir. 1997) (holding the recognition of a foreign judgment requires both reciprocity on the part of the foreign sovereign and fulfillment of other specific criteria to be recognized as a judgment); *Philadelphia Gear Corp. v. Philadelphia Gear de Mexico, S.A.*, 44 F.3d 187, 193–94 (3d. Cir. 1994) (applying comity in light of a parallel proceeding in a Mexican court); *Somportex*, 453 F.2d 435, 444 (3d Cir. 1971) (applying principles of international comity in respecting an adjudication by an English tribunal).

Even in the context of a foreign court's judgment, we condition application of international comity on reciprocity, *Saroop*, 109 F.3d at 170, taking into account several criteria, including the foreign court's jurisdiction, the proceedings involved, and indicia of due process, *see id.* (quoting *Hilton*, 159 U.S. at 202–03).

We are aware of one instance where comity principles have been applied, despite the absence of a foreign judgment, foreign proceeding, or a "true conflict" between United States and foreign law. In *Ungaro-Benages v. Dresdner Bank AG*, the Court of Appeals for the Eleventh Circuit drew a distinction between traditional "retrospective" application of international comity—which respects the judgment of a foreign court or

71

defers to parallel foreign proceedings—and prospective application. 379 F.3d 1227, 1237–39 (11th Cir. 2004).

In the context of a case involving Holocaust-era property claims, the Eleventh Circuit appeared to expand a conflict principle into a broader abstention doctrine, and delineated the factors it would consider in a prospective application: the interests of the United States government, those of the foreign government, and those of the international community in resolving the dispute in a foreign forum. *Id.* at 1238. We remain skeptical of this broad application of the international comity doctrine, noting our "virtually unflagging obligation" to exercise the jurisdiction granted to us, *Colorado River v. United States,* 424 U.S. 800, 817 (1976), which is not diminished simply because foreign relations might be involved, *cf. Baker,* 369 U.S. at 211("[I]t is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance.").

Even under a prospective application of the comity doctrine, we are skeptical that Germany's interest in resolving the dispute in Germany eclipses the interests of the United States or its citizens in adjudicating the merits of the dispute in a United States court. Nor do we have any assurance that claimants would have a forum available to them in Germany.

Accordingly, we decline to abstain from adjudicating the merits of this case under the international comity doctrine.

## V. Conclusion

We will reverse the judgment of the District Court, and remand for proceedings consistent with this opinion.