

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-10-2008

# Gross v. German Foundation

Precedential or Non-Precedential: Precedential

Docket No. 07-3726

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Gross v. German Foundation" (2008). *2008 Decisions.* Paper 16.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/16

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 07-3726 & 07-3727
_____

ELLY GROSS;
ROMAN NEUBERGER; JOHN BRAND,
in their individual capacities as third-party beneficiaries
of the agreements leading to the establishment of the
German Foundation "Remembrance, Responsibility and the
Future", as representatives of all German Foundation
beneficiaries; SYLVIA GREENBAUM,

Appellants in 07-3726

v.

THE GERMAN FOUNDATION INDUSTRIAL
INITIATIVE, and its constituent managing companies;
ALLIANZ AG; BASF AG; BAYER AG; BMW AG;
COMMERZBANK AG; DAIMLERCHRYSLER AG;
DEUTSCHE BANK AG; DEGUSSA-HUELLS AG; DEUTZ
AG; DRESDNER BANK AG; FRIEDR KRUPP AG
HOESCH KRUPP; HOECHST AG; RAG AG; ROBERT
BOSCH GMBH, SIEMENS AG; VEBA AG;
VOLKSWAGEN AG, sued individually; and as members of
the German Foundation Industrial Initiative

_____

1

BARBARA SCHWARTZ LEE; BERNARD LEE,

Appellants in 07-3727
v.

DEUTSCHE BANK, AG; DRESDNER BANK, AG

_____

On Appeal from the United States District Court
for the District of New Jersey
(Civ. Action Nos. 02-cv-02936 and 03-cv-03181)
District Judge:  Honorable Dickinson R. Debevoise

_____

Argued October 29, 2008

Before: McKEE, NYGAARD, and MICHEL,[*] *Circuit Judges*.

(Opinion Filed: December 10, 2008)

BURT NEUBORNE, ESQUIRE (ARGUED)
New York University Law School
40 Washington Square South
New York, New York 10012

---

[*]The Honorable Paul R. Michel, Chief Judge of the United States Court of Appeals for the Federal Circuit, sitting by designation.

AGNIESZKA M. FRYSZMAN, ESQUIRE
(ARGUED)
MICHAEL D. HAUSFELD, ESQUIRE
KATHLEEN M. KONOPKA, ESQUIRE
HILARY K. RATWAY, ESQUIRE
Cohen, Milstein, Hausfeld & Toll P.L.L.C.
1100 New York Avenue, N.W., West Tower,
Suite 500
Washington, D.C. 20005

LISA J. RODRIGUEZ, ESQUIRE
Trujillo Rodriguez & Richards, LLC
3 Kings Highway West
Haddonfield, New Jersey 08033

ALLYN Z. LITE, ESQUIRE
Lite, Depalma, Greenberg & Rivas
Two Gateway Center, 12th Floor
Newark, New Jersey 07102
  Attorneys for Appellants, Elly Gross,
  Barbara Schwartz Lee, and Bernard Lee

JEFFREY BARIST, ESQUIRE (ARGUED)
SANDER BAK, ESQUIRE
FELIX WEINACHT, ESQUIRE
Milbank, Tweed, Hadley & McCloy
One Chase Mahattan Plaza
New York, New York 10005
  Attorney for Appellees,
  Deutsche Bank and Dresdner Bank

ROGER M. WITTEN, ESQUIRE (ARGUED)
LOUIS R. COHEN, ESQUIRE
JOHN A. TRENOR, ESQUIRE
MATTHEW E. DRAPER, ESQUIRE
Wilmer Cutler Pickering Hale and Dorr LLP
399 Park Avenue
New York, New York 10022
    Attorney for Appellees, Allianz AG,
    Bayer AG,Commerzbank AG, Degussa-
    Huells AG, Deutz AG, and RAG AG

KONRAD L. CAILTEUX, ESQUIRE
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
    Attorney for Appellee, BMW AG

BUD G. HOLMAN, ESQUIRE
PAUL DOYLE, ESQUIRE
Kelley, Drye & Warren
101 Park Avenue, 29th Floor
New York, New York 10178
    Attorney for Appellee, DaimlerChrysler
    AG

JOHN J. GIBBONS, ESQUIRE
TERRY MYERS, ESQUIRE
THOMAS R. VALEN, ESQUIRE
Gibbons P.C.
One Gateway Center

Newark, New Jersey 07102
    Attorneys for Appellee, ThyssenKrupp
    AG

BRANT W. BISHOP, ESQUIRE
ORESTE P. MCCLUNG, ESQUIRE
Kirkland & Ellis LLP
655 15th Street, N.W.
Washington, D.C. 20005
    Attorney for Appellee, Siemens AG

THOMAS M. MUELLER, ESQUIRE
MARK D. MCPHERSON, ESQUIRE
Morrison & Foerster LLP
1290 Avenue of the Americas
New York, New York 10104-0050
    Attorney for Appellee, BASF AG

NEIL MCDONELL, ESQUIRE
BRIAN E. MCGUNIGLE, ESQUIRE
DEIRDRE SHERIDAN, ESQUIRE
Dorsey & Whitney LLP
250 Park Avenue
New York, New York 10177
    Attorney for Appellee, Robert Bosch
GmbH

DANIEL V. GSOVSKI, ESQUIRE
IAN CERESNEY, ESQUIRE
Herzfeld & Rubin P.C.
40 Wall Street

New York, New York 10005
    Attorney for Appellee, Volkswagen AG

_____

## OPINION OF THE COURT
_____

MICHEL, *Chief Circuit Judge*.

At issue in this World War II reparations case is whether the Joint Statement of the Berlin Accords constitutes a privately enforceable contract between some of the participants to the Joint Statement. Appellants contend that the defendant German companies owe "interest" on their payments to a reparations fund created by the Berlin Accords. In a prior appeal to our court, we held that the claim presented a justiciable issue not foreclosed by the political question doctrine. Having again considered the allegations of the complaints, we hold that the disputed interest provision of the Joint Statement does not

6

constitute or confer a privately enforceable cause of action on the Appellants, who assert standing as third-party beneficiaries. In so holding, we note the thoroughness of the district court's analysis and reasoning. Because we agree with Judge Debevoise's rationale, we adopt it as ours, with some minor points as described herein.

## I. Background

Because the history and facts of this case are set forth in ample detail in our previous opinion, *Gross v. German Foundation Industrial Initiative*, 456 F.3d 363 (3d Cir. 2006) ("*Gross II*"), and the two district court opinions, *Gross v. German Foundation Industrial Initiative*, 499 F. Supp. 2d 606 (D.N.J. 2007) ("*Gross III*"), and *In re Nazi Era Cases Against German Defendants Litigation*, 320 F. Supp. 2d 235 (D.N.J.

7

2004) ("*Gross I*"), we do not repeat them here.[1]  Rather, we briefly summarize the history and facts, insofar as they aid the present discussion.

The claims here involve reparations for Nazi-era slave labor, forced labor, appropriation of personal property, and dishonored insurance policies.  As early as 1998, the United States and German governments, aware of the significance of the claims and the seriousness of the risk posed to the German economy, encouraged negotiations between the plaintiffs and the defendant German corporations.  The negotiations involved senior diplomatic executives from both the U.S. and German governments, specifically and respectively former Deputy

[1]Several other cases have also detailed the history of the Berlin Accords and the reparation claims at issue here.  *See generally Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003); *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424 (D.N.J. 1999); *Burger-Fischer v. Degussa AG*, 65 F. Supp. 2d 248 (D.N.J. 1999).

Secretary of the Treasury Stuart Eizenstat and Count Otto Lambsdorff, chief negotiator for former German Chancellor Gerhard Schroeder. Several German companies came together as the German Foundation Industrial Initiative ("the Initiative"), which acted as the negotiating arm of the German industry. Representing the claimants were plaintiffs' attorneys who had filed the U.S. civil actions.

After many months of intense negotiations and significant lucubration, on July 17, 2000, a diplomatic agreement, commonly referred to as the Berlin Accords or the Berlin Agreements, was reached as a means of resolving these long-standing claims. Under the agreement, the German Foundation "Remembrance, Responsibility and the Future" ("the Foundation") was established as the intended, exclusive forum for receiving, processing, and paying reparation claims at issue here. Germany and the German companies each agreed to

9

contribute DM 5 billion to fund the Foundation. The plaintiffs' lawyers agreed to dismiss with prejudice the numerous pending litigations, so that the victims would receive payment through the Foundation rather than civil actions and that the German companies would achieve "all-embracing and enduring legal peace."

The Berlin Accords consist of (1) the Joint Statement, (2) the Executive Agreement between the United States and Germany, and (3) the Foundation Law. The Joint Statement—formally titled "The Joint Statement on occasion of the final plenary meeting concluding international talks on the preparation of the Foundation 'Remembrance, Responsibility and the Future'"—sets forth a goal of the Foundation, which is to "provide dignified payments to hundreds of thousands of survivors and to others who suffered from wrongs during the National Socialist era and World War II." Joint Statement,

10

pmbl. ¶ 12.  The Joint Statement commits the German government and German industry to provide DM 10 billion in capitalization.  As structured, the Initiative would collect DM 5 billion from individual German companies and then transfer the money to the Foundation.  Particularly significant for this case, the last sentence of Paragraph 4(d) of the Joint Statement states:

> German company funds will continue to be collected on a schedule and in a manner that will ensure that the interest earned thereon before and after their delivery to the Foundation will reach at least 100 million DM.

The second document, the Executive Agreement, outlines the U.S. and German governments' commitments to the Foundation and obligates the United States Executive, in all cases for which it is notified of a claim against a German company arising out of the WWII era, to file a statement of its

11

foreign policy interests with the court in which the claim is pending, stating that United States' foreign policy interests favor resolution through the Foundation. The third document, the Foundation Law, is codified under German law and establishes the Foundation as the legal entity for processing claims and distributing the DM 10 billion fund.

On May 30, 2001, the German legislature declared "legal peace," triggering the obligations of the German government and the German companies to each pay DM 5 billion to the Foundation. The German government made timely payment, but the Initiative did not complete payment until December 2001, at which point it had transferred DM 5.1 billion, which included DM 100 million as the "interest" designated in Paragraph 4(d) of the Joint Statement.

Due to the delay in the Initiative's payment and the differing assertions of what the "interest" provision mandated,

12

several claimants filed suit, attempting to enforce the "interest" provision of the Joint Statement. In June 2002, Elly Gross and others filed their complaint as third-party beneficiaries seeking recovery for breach of contract against the Initiative and against its founding companies. They alleged that the German corporations owed interest in excess of the DM 100 million already paid, based on the Initiative's financial obligation from and after July 17, 2000, the date the Joint Statement was signed. In July 2003, Bernard and Barbara Schwartz Lee brought a similar breach of contract action against Deutsch Bank AG and Dresdner Bank AG. They allege that the two banks agreed to pay interest earned on their payment from December 14, 1999.

These complaints were assigned to Judge Bassler. The Initiative and the defendant corporations moved to dismiss the complaints pursuant to Federal Rule of Civil Procedure 12(b)(6)

13

and argued, in the alternative, that the claims were nonjusticiable. In a single opinion, the district court held that the claims were not justiciable. *Gross I*, 320 F. Supp. 2d at 254. On appeal, we reversed, holding that, while the claims implicated foreign policy issues within the realm of the Executive Branch, the case was nevertheless justiciable. *Gross II*, 456 F.3d at 377–91. We also noted that "[a] court would face at least two questions on the merits of this dispute: (1) is the Joint Statement, or part of the Joint Statement, enforceable as a private contract, and (2) if so, what 'interest' obligation, if any, did the parties intend for the German Foundation Industrial Initiative?" *Id.* at 387.

On remand, the cases were reassigned to Judge Debevoise. Among other motions, defendants in the *Gross* case moved to dismiss under Rule 12(b)(6) on the basis that the claims were not privately enforceable. Defendants in the

14

*Schwartz Lee* case moved to dismiss on the basis of a lack an enforceable December 1999 contract. In a single opinion, Judge Debevoise dismissed both complaints, holding that the Joint Statement is not a contract but a political document and thus does not confer a private cause of action on the plaintiffs. *Gross III*, 499 F. Supp. at 610. Plaintiffs in both cases timely appealed on September 11, 2007.

## II. Standard of Review and Jurisdiction

The district court had diversity jurisdiction under 28 U.S.C. § 1332(a)(2).[2] We have jurisdiction under 28 U.S.C. § 1291. We review *de novo* the district court's dismissal of the action under Federal Rule of Civil Procedure 12(b)(6). *Phillips*

---

[2]*Gross* Appellants also contend that the district court had federal question jurisdiction under 28 U.S.C. § 1331, but they have not briefed the issue. Judge Bassler, held that the court had diversity jurisdiction only, *see Gross I*, 320 F. Supp. at 238–39, and we need not address the issue here.

*v. County of Allegheny*, 515 F.3d 224, 230 (3d Cir. 2008); *see also In re Paoli R.R. Yard PCB Litig.*, 221 F.3d 449, 461 (3d Cir. 2000) ("*De novo* means [that] . . . the court's inquiry is not limited to or constricted by the . . . record, nor is any deference due the . . . conclusion [under review]." (quotation omitted)). In our plenary review, we apply the same legal standard of determining whether a plaintiff has stated a valid claim, *viz.* "'a complaint with enough factual matter (taken as true) to suggest' the required element." *Phillips*, 515 F.3d at 234 (*quoting Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007)). We must accept the complaint's allegations as true and draw all reasonable inferences in favor of the non-movant. *Worldcom, Inc. v. Graphnet, Inc.*, 343 F.3d 651, 653 (3d Cir. 2003).

Appellants ask us to determine whether the Joint Statement confers a private cause of action for their breach of contract claim. If it does, then Appellants' complaints are "a

16

proper exercise of [their] 'right . . . to seek judicial relief from injuries caused by another's violation of a legal requirement.'" *See McKesson Corp. v. Islamic Republic of Iran*, 539 F.3d 485, 488 (D.C. Cir. 2008) (*quoting Cannon v. Univ. of Chicago*, 441 U.S. 677, 730 n.1 (1979) (Powell, J., dissenting)). We review the interpretation of an international agreement *de novo*. *United States ex rel. Saroop v. Garcia*, 109 F.3d 165, 167 (3d Cir. 1997); *see also McKesson*, 539 F.3d at 488; *United States v. Al-Hamdi*, 356 F.3d 564, 569 (4th Cir. 2004) ("Interpretation of an international treaty is an issue of law subject to de novo review.").

## III. Application of the Law of International Agreements

In setting forth our analysis, we reiterate that we do so only to the extent necessary to supplement the well-reasoned analysis of the district court. Below, we first confirm the district court's turn to the law of international agreements as providing

the legal framework for examining the Joint Statement.  Next, applying those principles, we expand on some additional points which warrant further discussion here.

A.

At the outset, Appellants contend that Judge Debevoise erred by applying treaty law as opposed to federal common law.  But we do not see merit in this argument.  The events leading to the Berlin Accords evince an unprecedented diplomatic effort to create an international agreement establishing a forum for the resolution of certain reparation claims and also to dispose of the pending legal actions.

As Judge Debevoise noted, "July 17, 2000, was the occasion of one of the most remarkable diplomatic achievements since the end of World War II." *Gross III*, 499 F. Supp. at 608.  It was on that day that eight sovereign nations, a

18

consortium representing numerous German companies, an international organization devoted to Nazi-era claims, and U.S. plaintiffs' attorneys together signed the Joint Statement of the Berlin Accords. Appellants cannot reasonably dispute the significant political nature of the talks leading to the Accords. Granted, one objective was to settle then-pending U.S. litigation between the plaintiffs and the defendant German companies, but we weigh that private aspect of the resolution against the Berlin Accords' political, diplomatic, and historical significance. The creation of the Berlin Accords was more than a mere settlement; it was a profound expiation by the Federal Republic of Germany and German companies. Indeed, from the start of the negotiations, Deputy Secretary Eizenstat, the lead U.S. negotiator, "was determined that the responsible foreign government [i.e., Germany], not just private companies, would have to be directly involved and directly engaged through a

19

senior official who would be [Eizenstat's] counterpart." Stuart E. Eizenstat, *Imperfect Justice: Looted Assets, Slave Labor, and the Unfinished Business of World War II* 215 (2003).

We recognize that the Joint Statement is not a formal treaty; nevertheless, it constitutes part of the understanding reached among sovereign nations and private parties. Negotiations occurred during plenary sessions comprising high-level executives of foreign nations. The signatories of the Joint Statement itself includes the representatives of eight different nations. Further, the Joint Statement has meaning only in the context of the entire Berlin Accords. Indeed, the Joint Statement by itself is incomplete, as it talks of the Foundation, but understanding what the Foundation is requires resort to the Foundation Law. In sum, the Joint Statement appears to be a unique document, the objectives of which are to memorialize the efforts of the diplomatic talks resolving both political and legal

20

issues. Thus, for at least these reasons, we agree with the district court that the law of international agreements provides the appropriate jurisprudential guidance in the analysis of whether the Joint Statement creates a private cause of action.

B.

To ascertain whether an international agreement creates a private cause of action, we first look to the text of the agreement. *See United States v. Alvarez-Machain*, 504 U.S. 655, 663 (1992) ("In construing a treaty, as in construing a statute, we first look to its terms to determine its meaning."). At the same time, however, a court has greater leeway to look beyond the words of an international agreement. *See, e.g.*, *Air France v. Saks*, 470 U.S. 392, 397 (1985) ("'[T]reaties are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical

21

construction adopted by the parties.'" (*quoting Choctaw Nation of Indians v. United States*, 318 U.S. 423, 431–32 (1943))). Moreover, "the public acts and proclamations of [foreign] governments, and those of their publicly recognized agents, in carrying into effect th[e] treaties, though not made exhibits in th[e] cause, are historical and notorious facts, of which the court can take regular judicial notice." *United States v. Reynes*, 50 U.S. (9 How.) 127, 147–48 (1850); *see also El Al Israel Airlines, Ltd. v. Tseng*, 525 U.S. 155, 167 (1999).

In general, a court's "role is limited to giving effect to the intent of the [t]reaty parties." *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 185 (1982). Thus, clear language controls unless it "'effects a result inconsistent with the intent or expectations of its signatories.'" *Id.* at 180 (*quoting Maximov v. United States*, 373 U.S. 49, 54 (1963)). In line with this precedent, and regardless of whether we apply any presumption

22

for or against private enforceability, our duty is to ascertain whether the signatories of the Joint Statement intended to permit a private cause of action against the German companies.

Our examination of the text of the Joint Statement and the entire Berlin Accords supports the district court's rationale and conclusion. We discern a strong intent on the part of the participants to enter into an agreement that is not enforceable through a private cause of action. First, the Joint Statement, along with the Berlin Accords as a whole, aspires to something other than simply the creation of a private, bargained-for exchange. One specific objective was to send "a conclusive, humanitarian signal, out of a sense of moral responsibility, solidarity and self-respect." Joint Statement, pmbl. ¶ 5. Another clear purpose was for the German companies to receive "all-embracing and enduring legal peace." *See* Executive Agreement, pmbl. ¶ 10, and arts. 2(1), 2(2), 3(1); Joint

23

Statement, pmbl. ¶ 13, and ¶ 4(b); Foundation Law, pmbl. ¶ 6.

Even without any presumptive approach, this language strongly

connotes an intent not to create a right of private action for only

some of the Joint Statement's participants.

Second, as the district court noted, the Joint Statement

uses language that is generally consistent with a non-binding

political document. The signatories of the Joint Statement refer

to themselves as "participants," not as "parties." Joint Statement

¶¶ 1–4. The participants "declare" rather than "agree" or

"undertake." *Id.* ¶ 1. The title of the document itself suggests

a non-binding arrangement. *See* Staff of S. Comm. on Foreign

Relations, 106th Cong., Print No. 106-71, *Treaties and Other*

*International Agreements: The Role of the United States Senate*

60 (Comm. Print 2001) ("Joint statements of intent are not

binding agreements unless they meet the requirements of legally

binding agreements, that is, that the parties intend to be legally

24

bound."). Each of these textual clues points towards a document without privately enforceable rights.

It is true, as Appellants point out, that some language of the Joint Statement can be read as suggesting binding obligations. For instance, Paragraph 4(d) does use the terms "will" and "shall" when describing the steps that the German companies intend to take. Appellants argue that such language should be read as imposing legally enforceable obligations on the German companies. But these few examples cannot overcome the contrary language indicating a non-binding nature. The Joint Statement contains insufficient rights-granting language to confer on Appellants a private cause of action.

Appellants also rely too much on textual hairsplitting between "shall" and "will," as used in the Joint Statement. Specifically, Gross argues that "shall" is used with judicially enforceable acts and "will" with unenforceable acts. Thus, their

argument goes, things that "will" be done are not privately enforceable, but things that "shall" be done are enforceable. We disagree with the alleged subtlety. For example, Paragraph 4(d) uses both "shall" and "will" in referring to the intended actions of the German companies: "the DM 5 billion contribution of the German companies *shall* be due"; "[t]he German companies *will* make available reasonable advanced funding"; "German company funds *will* continue to be collected." Joint Statement ¶ 4(d) (emphases added). The Joint Statement also uses "shall" and "will" interchangeably with the German government and the German companies. *Id.* ¶¶ 4(a), 4(d). Even if a clear difference in meaning exists between "shall" and "will"—and we are not convinced there always is, *see Hewitt v. Helms*, 459 U.S. 460, 471 (1983) (characterizing "shall," "will," and "must" as "language of an unmistakably mandatory character")—the

26

distinction is not borne out in the Joint Statement's text.[3]

Appellants also propose that the district court erred by not severing the last sentence of Paragraph 4(d) from the rest of the Joint Statement. According to their argument, severability permits that sentence to be the grant of private enforceability. Without doubt, treaties and international agreements can include sections that are privately enforceable amidst sections not privately enforceable. *See Lidas, Inc. v. United States*, 238 F.3d 1076, 1080 (9th Cir. 2001) (holding that the United States-France Income Tax Treaty's "exchange of information provisions . . . are severable from the double taxation provisions"); *United States v. Postal*, 589 F.2d 862, 884 n.35

---

[3] We note in passing that Schwartz Lee does not see any distinction between "shall" and "will" and considers both to be mandatory. Schwartz Lee Appeal Br. 34 ("The words 'shall' and 'will' indicate the binding nature of the agreement.").

(5th Cir. 1979) ("A treaty need not be wholly self-executing or wholly executory."); *see also* Restatement (Third) Foreign Relations Law of the United States § 111 cmt. h (1986) ("Some provisions of an international agreement may be self-executing and others non-self-executing.").  And we do not ignore these precedents.  The test here is not, however, an overly formalistic application of any particular doctrinal rule.  Rather, our charge is to remain true to what the participants envisioned as their intended outcome, as shown through interpretative methods discussed above.  In this case, the Joint Statement's language does not lend itself to the dichotomous approach urged by Appellants.  Excision of a single sentence from the body of the Joint Statement, and from the entire Berlin Accords, invites departure from the participants' intentions.

At oral argument, Appellants' counsel repeated their contention that it would "have been an act of temporary insanity

28

for experienced counsel to have agreed to dismiss sixty cases with prejudice prior to payment, without the existence of a judicially enforceable means of insuring compliance." But we think this assertion is tenuous and overstates the situation. As the district court recognized, Appellants' counsel were not dismissing the actions with only the slim hope or gamble that the German companies might proceed with their payments. Counsel dismissed the complaints, in part, because the Joint Statement had the support and backing of the governments of both the United States and the Federal Republic of Germany. Indeed, but for the actions of President Clinton and Chancellor Schroeder, it is questionable whether the negotiations would have been fruitful. *See Imperfect Justice* 243-58 (describing the critical involvement of President Clinton and Chancellor Schroder during the negotiations in December 1999). Had the German companies opted to not complete their payments to the Initiative,

serious political consequences and executive discomfiture would have resulted.

Moreover, despite Gross's argument to the contrary, the district court did not find that Appellants' only recourse rests exclusively with the German Ministry of Finance. The assertion runs counter to the undisputed fact that Appellants always retained the option to reopen litigation through Federal Rule of Civil Procedure 60(b). Indeed, Appellants could have utilized that procedure, but, to avoid jeopardizing the entire, politically sensitive resolution and the payment of the DM 10 billion to the victims, claimants declined to move to reopen litigation under Rule 60(b). *See In re Nazi Era Cases Against German Defendants Litig.*, 213 F. Supp. 2d 439, 442 (D.N.J. 2002). Instead, they asked the court to define and enforce the defendants' "interest" obligation. On July 23, 2002, the district court declined to do so, holding that jurisdiction to enforce the

30

Joint Statement was absent. *Id*. at 450–51. Appellants chose not to appeal that decision. What the district court in the present case concluded was that, given the Foundation's procedure and the option under Rule 60(b), the participants to the Joint Statement exhibited, through the text and structure of the Berlin Accords, an intent not to legally bind other participants by a contractual right enforceable through U.S. litigation. In our view, the district court correctly construed the terms of the Joint Statement and the arduous negotiations leading to the Joint Statement as manifestations of all participants' intentions to implement a non-judicial procedure for resolving further disputes.

C.

Appellants urge us to consider the litigious context in which the Joint Statement was drafted. In this context of settling class action lawsuits, Gross argues, the Joint Statement

must be viewed as a quasi-settlement fashioned after a settlement agreement pursuant to Federal Rule of Civil Procedure 23. We are cognizant of the drafting environment, but we remain convinced that the manifested intentions of the participants were to create a document that set forth the objectives of the negotiations without granting privately enforceable contractual rights, other than any provided by the Foundation Law. If the contextual evidence does anything, it strengthens our belief that the participants to the Joint Statement did not contemplate an agreement which would require further legal wrangling in courts.

To the extent that the district court considered the history of the Berlin Accords, we agree with the court's reliance on the general approach set forth in *Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 373 (7th Cir. 1985). Although *Frolova* concerns a formal treaty, the factors listed are

32

just as applicable here in analyzing whether the historical context surrounding the Joint Statement evinces an intent to confer privately enforceable rights.

D.

We also briefly address Gross's position that the Supreme Court has implicitly rejected the district court's approach in assessing the private enforceability of the Joint Statement. Gross relies upon *Medellín v. Texas*, 128 S. Ct. 1346 (2008), and its analysis of whether the Vienna Convention's Optional Protocol Concerning the Compulsory Settlement of Disputes, the United Nations Charter, and the International Court of Justice Statute were self-executing treaties. In Appellants' view, *Medellín* does away with any presumption against self-execution of treaties.

An overly strict reliance on the concept of "self-executing" versus "non-self-executing" treaties may be misleading in this case. A self-executing treaty is one which "do[es] not require domestic legislation to give [it] the full force of law." *Renkel v. United States*, 456 F.3d 640, 643 (6th Cir.

34

2006) (*citing Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 252 (1984)). By itself, the status of "self-executing" does not answer the question of whether a document creates a private right of enforcement. *See* Restatement (Third) of Foreign Relations Law of the United States § 111 cmt. h (1986) ("Whether a treaty is self-executing is a question distinct from whether the treaty creates private rights or remedies."); *see also United States v. Li*, 206 F.3d 56, 68 (1st Cir. 2000) (*en banc*) ("[T]he self-executing character of a treaty does not by itself establish that the treaty creates private rights."). Thus, even if we were faced with a treaty, *Medellín*'s self-execution discussion does not complete the picture.

As we see it, *Medellín* does not undermine the district court's analysis. The Supreme Court recognized that, "[e]ven when treaties are self-executing in the sense that they create federal law, the background presumption is that '[i]nternational

35

agreements, even those directly benefitting private persons, generally do not create private rights or provide for a private cause of action in domestic courts.'" *Medellín*, 128 S. Ct. at 1357 n.3 (*quoting* Restatement (Third) of Foreign Relations Law of the United States § 907, cmt. a (1986)). We have agreed with this approach, *see Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287, 1298 (3d Cir. 1979), as have several of our sister courts. *See, e.g.*, *United States v. Emuegbunam*, 268 F.3d 377, 389–90 (6th Cir. 2001); *Garza v. Lappin*, 253 F.3d 918, 924 (7th Cir. 2001) ("[A]s a general rule, international agreements, even those benefitting private parties, do not create private rights enforceable in domestic courts."); *United States v. Jimenez-Nava*, 243 F.3d 192, 195 (5th Cir. 2001); *United States v. Li*, 206 F.3d 56, 60–61 (1st Cir. 2000) (*en banc*); *Goldstar (Panama) S.A. v. United States*, 967 F.2d 965, 968 (4th Cir. 1992); *Canadian Transp. Co. v. United States*, 663 F.2d 1081,

1092 (D.C. Cir. 1980). Thus, when determining the intent of the Joint Statement's participants, we keep in mind the accepted approach that, "[w]hen no [privately enforceable] right is explicitly stated, courts look to the treaty as a whole to determine whether it evidences an intent to provide a private right of action." *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 808 (D.C. Cir. 1984) (Bork, J., concurring).

Again, we emphasize that we do not apply a strict presumption in this case. Rather, we draw from the state of international agreement law to understand better what the text of the Joint Statement teaches about the intentions of the signing participants. Being sophisticated negotiators and litigants, the participants worked not in a vacuum but in the international negotiating arena. International agreement law therefore acts as a useful judicial prism through which to view the textual evidence of the participants' intentions.

37

E.

Finally, we note that the issue of whether the "interest" provision is a privately enforceable contractual right can be seen from another vantage point, which we believe confirms that the dispute here is not based on a privately enforceable right. Appellants have characterized the present "interest" claim as being completely distinct from a claimant's application for restitutionary funds. Framed as such, the pending lawsuit does not appear to be asking for a larger restitutionary payment for Elly Gross or the other plaintiffs. This seems the right strategy because, if the claim were for an explicit request for a larger restitution-based payment, the case would surely fail. Such a claim would be covered exclusively by the process set forth in the Foundation Law.

When we look closer, however, and consider the potential result had Appellants been successful, the requested

relief reveals itself as a request for increased restitutionary funds for Ms. Gross and the other plaintiffs. As we see it, Appellants' contention is that each plaintiff has not received the appropriate amount of money under plaintiffs' interpretation of the Joint Statement because the German companies have not paid enough "interest." We recognized as much in our prior opinion. *See Gross II*, 456 F.3d at 380 ("It is true that a judgment for the claimants would require payment to the Foundation, translating to increased payments to victims."). Viewing the pending suit from this perspective further confirms the district court's analysis and conclusion that the signing participants of the Joint Statement did not intend for the "interest" provision to confer a privately enforceable contractual right on only some of the signatories.

To the extent Appellants read *Gross II* as effectively deciding the issue before us today, that is error. The issue in

*Gross II* was only whether the case was justiciable. Justiciability involves, for the most part, concerns of separation of powers. *Nixon v. United States*, 506 U.S. 224, 252–53 (1993) (Souter, J., concurring) ("[T]he political question doctrine is 'essentially a function of the separation of powers,' existing to restrain courts 'from inappropriate interference in the business of the other branches of Government . . . .'" (citation omitted) (*quoting United States v. Munoz-Flores*, 495 U.S. 385, 394 (1990))).  The question we decide today, on the other hand, is one grounded in the intentions of the signatories to the Joint Statement. *See Sumitomo*, 457 U.S. at 185 ("Our role is limited to giving effect to the intent of the [t]reaty parties.").  Thus, a particular claim may be justiciable, in that it is not best reserved for the Executive Branch, but may nevertheless lack a foundational cause of action because that is what the participants contemplated.

## IV. Application to *Schwartz Lee* Plaintiffs

The *Schwartz Lee* Appellants dispute the propriety of applying the judgment to dismiss the *Gross* complaint to the *Schwartz Lee* complaint. They contend that the district court could not dismiss their complaint because the defendant banks in the *Schwartz Lee* case (i.e., Deutsche Bank AG and Dresdner Bank AG) never moved to dismiss based on the lack of a private cause of action. Rather, the Banks' motion to dismiss asserted that no enforceable contract existed between plaintiffs and defendants.

First, we note that the two *Schwartz Lee* plaintiffs are members of the putative class in the *Gross* action. Barbara Schwartz Lee and Bernard Lee both averred that they are beneficiaries of the Foundation. Schwartz Lee Compl. 4-5. The putative class in the *Gross* case comprises all beneficiaries of the Foundation. Gross Compl. 3. Also, the two defendant banks

41

in *Schwartz Lee* are individually named as defendants in the *Gross* case.

Second, although docketed as separate cases, the two have proceeded as if one. In *Gross I*, Judge Bassler issued a single opinion that temporarily disposed of both actions. On appeal in *Gross II*, we reviewed that dismissal as if the two cases were a single action. Likewise, when remanded to the district court, the litigants continued on a single course with but minor differences in their "interest" calculations. Arguments for the dispositive motions were heard during a single session before Judge Debevoise on April 17, 2007.

The situation before us does not raise fairness concerns sought to be addressed by the doctrines of issue and claim preclusion. *See Nat'l R.R. Passenger Corp. v. Pa. Pub. Util. Comm'n*, 288 F.3d 519, 525 (3d Cir. 2002) ("Th[e] general rule [of collateral estoppel] is subject to a number of equitable

42

exceptions designed to assure that the doctrine is applied in a manner that will serve the twin goals of fairness and efficient use of private and public litigation resources."). Schwartz Lee's attorneys had notice that the Initiative moved to dismiss the complaint as privately unenforceable. Furthermore, in a letter to the district court dated November 22, 2006, counsel for plaintiffs in both *Gross* and *Schwartz Lee* presented arguments countering the Initiative's position that the Joint Statement was not privately enforceable. Counsel presented their arguments on the letterhead of Lite DePalma Greenberg & Rivas, LLC, local counsel for both sets of plaintiffs. The letter was signed by 1) Burt Neuborn, counsel for *Gross* plaintiffs; 2) Michael Hausfeld and Agnieszka Fryszman, counsel for *Schwartz Lee* plaintiffs; and 3) Allyn Z. Lite, "Plaintiffs' Liaison Counsel." The letter set forth a cogent summary of the plaintiffs' position without distinguishing between the two cases. From the district court's

43

perspective, plaintiffs in both cases were aware of and addressed a common basis for dismissal.

Moreover, Schwartz Lee has not presented any argument or position overlooked by the district court. Thus, even if we were to vacate the district court's dismissal of the *Schwartz Lee* complaint, the only logical outcome after remanding would be dismissal. Accordingly, we find no error in the district court's dismissal of Schwartz Lee's complaint.

## V. Conclusion

For the foregoing reasons, we affirm the district court's dismissal of the complaints.